**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DARBIANNE GOODWIN,<br>                              Plaintiff,<br><br>                    v.<br><br>PENNRIDGE SCHOOL DISTRICT, AND<br>JACQUELINE A. RATTIGAN AND GINA<br>DEBONA, in their official and individual<br>capacities,<br>                              Defendants. | Case No.<br><br><br>**COMPLAINT AND**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff, DarbiAnne Goodwin, by and through her attorneys, alleges the following on
information and belief:

## INTRODUCTION

1.      When Miss Goodwin was a sophomore at Pennridge High School ("PHS"), she
was raped by a junior who attended the same school. Miss Goodwin was traumatized and
suffered from post-traumatic stress disorder (PTSD) as a result of the rape. She turned to the
school's senior administration, asking for their help in dealing with the reality that she and her
rapist attended the same school. Not only did PHS's administrators fail to adequately investigate
the rape, but they also repeatedly failed to take even the most basic of steps to accommodate
Miss Goodwin continuing to receive her education in a safe and respectful educational
environment at PHS.

2.      Compounding matters, PHS's failure to respond to Miss Goodwin's repeated
reports of sexual harassment created an environment that empowered H. and his friends to
retaliate against Miss Goodwin for reporting the rape. After Miss Goodwin reported the rape to
officials at PHS, the rapist and his friends embarked on a years'-long campaign of physical and
verbal sexual harassment against her, shoving her in the halls; calling her a "bitch" and

threatening her over text message. This campaign continues today even after all of the boys have graduated.

3.       Over the course of two years, Miss Goodwin and her mother repeatedly reported the sexual harassment to Pennridge School District ("PSD") officials, including Superintendent Jacqueline Rattigan ("Rattigan") and Principal Gina DeBona ("DeBona"). Again and again, Pennridge administrators' response was to promise little and deliver even less. By way of example, one "solution" that was eventually discussed was that Miss Goodwin, an excellent student who had been active in extracurricular activities, including the debate team and Student Council, attend an "alternative school" whose student population consisted primarily of expelled students and students who had behavioral challenges. As Miss Goodwin would later learn, PSD administrators have a pattern and practice of sweeping sexual harassment under the rug by refusing to investigate victims' claims and encouraging the victims to drop out of PHS and attend this alternative school.

4.       As a direct result of Pennridge's administrators' insufficient action plans and broken promises, Miss Goodwin missed multiple days of school per week during her junior year; her GPA plummeted from a 3.9 to a 3.2; and she felt compelled to temporarily attend a pilot cyber program in order to escape the harassment that Pennridge administrators had allowed to persist.

5.       Pennridge, Superintendent Rattigan, and Principal DeBona, who had actual knowledge of the severe and pervasive sexual harassment to which Miss Goodwin had been subjected, created a sexually hostile environment when they failed to address the harassment appropriately. By acting with deliberate indifference to that knowledge, PSD and its administrators subjected Miss Goodwin to sexual harassment and deprived her of equal access to

2

educational opportunities in violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a). PSD and its employees also violated Miss Goodwin's rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, as well as tort law.

## JURISDICTION

6.     This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331, 1343, and 2201 as this is a civil action arising under the Constitution and laws of the United States. This Court has jurisdiction over supplemental claims arising under Pennsylvania law pursuant to 28 U.S.C. § 1367(a).

7.     Venue lies in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because at least one defendant is a resident of the Eastern District of Pennsylvania. Venue also lies in this district pursuant to 28 U.S.C. § 1391(c) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

8.     DarbiAnne Goodwin is an 18-year-old senior at Pennridge High School.

9.     Pennridge School District is a public school district in Perkasie, Pennsylvania that encompasses Pennridge High School. PSD receives federal funding.

10.     Jacqueline Rattigan is the Superintendent of PSD. She has served as Superintendent and a final policymaker since 2013.  A final policymaker is an individual who is empowered with final authority over certain policies within PSD. Pursuant to PSD's policy, the Superintendent makes final decisions regarding a number of matters, including expulsions for repeated physical assaults and aggressive behavior.

11.     Gina DeBona is the Principal of PHS. She has served as Principal since 2014. DeBona was a final policymaker empowered to make, review, and approve final decisions about her school's functions. PSD policy grants unreviewable discretion to the principal in resolving harassment complaints.

## FACTS

12.     Since preschool, Miss Goodwin has been enrolled in a school within PSD. In fall 2013, she enrolled in PHS as a freshman.

13.     Miss Goodwin was an excellent student who consistently achieved excellent grades—maintaining a 3.9 GPA—and was involved in extracurricular activities, such as the Student Council, debate team, and the Student Ambassador Program, until PSD failed to appropriately respond to and address Miss Goodwin's reports of rape and further sexual harassment.

14.     On December 27, 2014, during Miss Goodwin's sophomore year, H., who was a junior at PHS, raped Miss Goodwin in the parking lot of a restaurant, The Country Place.

15.     Miss Goodwin, who was 15-years-old at the time, suffered severe trauma as a result of the rape. Ultimately, Miss Goodwin's psychiatrist, Martina Susko, and therapist, Jon Getz, diagnosed Miss Goodwin with post-traumatic stress disorder ("PTSD").

16.     In addition to the rape, Miss Goodwin soon discovered that H.'s friends were spreading rumors among fellow students about the night that she had been raped. According to one of Miss Goodwin's friends, H.'s friend had told others that on the night of the rape, Miss Goodwin had consented to have sex with multiple PHS students.

17.     In February 2015, unable to shoulder the burden alone, Miss Goodwin told both her therapist and her mother, a long-time proud and loyal PSD volunteer, about the assault.

18.     In March 2015, Miss Goodwin reported the rape to the police, who began an investigation. Like most victims, Miss Goodwin never saw her assailant prosecuted.

19.     Also in March 2015, Miss Goodwin's mother met with the Assistant Principal, Scott Hegen ("Hegen"), who was the principal for the sophomore class, or the "grade principal." She informed him that Miss Goodwin had been raped by H. in December 2014. Hegen incorrectly told Miss Goodwin's mother that he could not take any disciplinary action in response to the rape because H. had not been criminally convicted and the incident took place off campus. Hegen took no further action. He did not initiate an investigation or discipline H. He also did nothing to protect Miss Goodwin from H., such as offer Miss Goodwin accommodations or propose a safety plan so that Miss Goodwin could continue to enjoy equal access to PHS's educational resources and benefits in a safe and respectful environment.

20.     PSD not only has a legal obligation, but also has an explicit policy stating that PSD has the ability to investigate reports of harassment even when they occur off campus. Moreover, PSD owes a basic duty of care to each and every one of its students.

21.     The school's policy is consistent with the U.S. Department of Education's policy. On April 4, 2011, the Department of Education issued a Dear Colleague letter (the "Dear Colleague letter") summarizing schools' obligations, as established by case law, to respond to sexual violence under Title IX. Therein, the agency advised schools that "regardless of where the conduct occurred, the school must process [a] complaint in accordance with its established procedures. Because students often experience the continuing effects of off-campus sexual harassment in the educational setting, schools should consider the effects of the off-campus conduct when evaluating whether there is a hostile environment on campus."

5

22.    PHS, however, has a custom or practice, as Hegen explicitly informed Miss Goodwin's mother, of not investigating or disciplining reports of off-campus harassment even when they lead to a hostile environment on campus at PHS. Principal DeBona, Superintendent Rattigan, and Hegen were aware of and acted according to this custom and practice.

23.    Upon information and belief, students of PSD regularly report claims of harassment that involve off-campus behavior. Despite the fact that these reports are common, PSD failed to supervise and train its employees regarding PSD's policy relating to off-campus behavior, which perpetuated the custom or practice of not investigating reports of off-campus harassment.

24.    Upon information and belief, PHS also has a custom or practice of not investigating or disciplining reports of harassment that do not result in criminal convictions.

25.    The 2011 Dear Colleague letter also explains that, under long-standing Supreme Court precedent, and as noted in agency guidance regularly released since 1981, schools have a responsibility to take "immediate and effective steps to end sexual harassment and sexual violence." The letter lays out required steps that schools must take to investigate and resolve complaints of sexual harassment.

26.    PSD and its officials also failed to provide essential training to staff and administrators about Title IX and sexual harassment. Court precedent and decades of Department of Education guidance make clear that schools have a responsibility to take prompt action to address sexual harassment of students. This case law and guidance, including the Dear Colleague letter, also make clear that schools should provide training to staff and administrators on sexual harassment.

27.     This lack of training resulted in PSD and its officials repeatedly violating their duties to remedy the sexual harassment Miss Goodwin experienced and, therefore, preventing her from accessing PSD's educational resources in a safe environment.

28.     In May 2015, a friend sent Miss Goodwin screen shots of text messages sent during school hours between H.'s friends. The messages indicated that H.'s friends intended to physically harm Miss Goodwin. For example, B., one of H.'s friends, threatened Miss Goodwin's safety, in retaliation for reporting the rape, stating that she "is getting jumped" and "needs to learn her place."

29.     On a separate occasion, H. confronted Miss Goodwin. He called her a "fucking bitch" in the hallway during school hours.

30.     Miss Goodwin reported the harassing text messages and H.'s verbal harassment to DeBona, PHS's head principal, and Hegen. Miss Goodwin, DeBona, and Hegen met and discussed the incidents. At no time during that meeting did DeBona propose any action responding to Miss Goodwin's reports of both physical and sexual harassment. PSD officials took no action "to reinforce the expectations of a safe environment for Darbi and all students" as required under the law and school policy or any other action to protect Miss Goodwin, other than cursorily informing his family. PSD took no disciplinary measures against H. or his friends. Not surprisingly, the harassment continued.

31.     PSD policy, as written and published, grants unreviewable discretion to its principals in resolving harassment complaints, rendering Principal DeBona a final policymaker on these matters. DeBona, in her capacity as a final policymaker, decided not to take any action responding to Miss Goodwin's report of harassment or helping ensure her access to an equal education in a safe and respected environment.

32.     By May 2015, Miss Goodwin was regularly missing classes—a fact that Hegen and Principal DeBona could observe when looking at attendance records. She rarely made it through a full day at PHS due to the hostile environment that she faced.

33.     Ultimately, Miss Goodwin decided that she could no longer attend PHS. Miss Goodwin submitted a letter to Hegen from her psychiatrist, Ms. Susko, and therapist, Mr. Getz, informing PHS that Miss Goodwin was unable to attend classes because of her trauma and anxiety stemming from the rape and exacerbated by the continued harassment.

34.     Again, further demonstrating its deliberate indifference, PSD and its officials, did not make any efforts to ensure Miss Goodwin could safely return to school. PSD and its officials did nothing to provide Miss Goodwin with an Individualized Education Plan ("IEP") to accommodate her diagnosed PTSD, or to propose a safety plan that would ensure that Miss Goodwin could continue to learn in a safe and respectful environment.

35.     Miss Goodwin completed her sophomore year of high school at home and returned only to take her finals.

36.     In August 2015, Miss Goodwin's mother contacted Hegen and urged PHS to take the steps necessary to ensure that Miss Goodwin could safely return to school and be granted the equal access to which she was legally entitled.

37.     During this same call, Miss Goodwin's mother also asked Hegen for PSD's Title IX Coordinator's contact information. All schools receiving Title IX funds are required to appoint a Title IX Coordinator who is the administrator responsible for addressing sex discrimination in the school.

38.     In response, Hegen admitted that he did not know who the Title IX Coordinator was or what she did. Only after conducting additional research was Hegen able to provide Miss Goodwin's mother with the contact information for Jacqui McHale, PSD's Title IX Coordinator.

39.     On August 24, 2015, Miss Goodwin's mother emailed McHale, describing Miss Goodwin's struggle to attend school, to focus on her classes, and to simply learn due to the rape and the constant harassment from H. and his friends. In this email, Miss Goodwin's mother proposed a possible solution: PHS could ensure that Miss Goodwin not share any classes with H., her rapist, or his friends, N., B., and C., her unrelenting harassers. Miss Goodwin's mother also offered to provide the harassing text messages if McHale required additional evidence.

40.     McHale replied to Miss Goodwin's mother's email and asked her for a meeting; on August 25, 2015, the two arranged to meet on September 2, 2015. McHale invited Principal DeBona and Hegen and Troy Price, the PSD administrator in charge of student affairs, to attend.

41.     Prior to the scheduled meeting, the school year began. Despite Miss Goodwin's mother's simple proposal that Miss Goodwin be separated from H., N., B., and C., Miss Goodwin immediately learned that she had been scheduled to share the most unsupervised events of the day with her harassers: she would share a study hall location with H. and lunch period with N., B., and C. Upon her return, it was clear to Miss Goodwin that PSD and its officials had not taken any steps to provide Miss Goodwin with a safe environment.

42.     On September 1, 2015, in preparation for the September 2 meeting, Miss Goodwin's mother sent McHale a timeline of events related to Miss Goodwin's rape and subsequent harassment. She also sent McHale a PowerPoint presentation on Title IX to help PSD's Title IX Coordinator understand her job responsibilities and Miss Goodwin's rights under federal civil rights law.

43.     On September 2, 2015, Miss Goodwin's mother met with McHale, Price, and Hegen at PHS. Although Principal DeBona was invited, she chose not to attend. Similar to the initial meeting, during the September 2 meeting, there was no discussion regarding investigating or disciplining Miss Goodwin's rapist or her harassers. In the meeting, the PSD officials and administrators yet again put the interests of Miss Goodwin's harassers before Miss Goodwin's. The administrators refused to change the harassers' schedules because they were seniors; Miss Goodwin could choose to be removed from "their classes." They told Miss Goodwin's mother that H.'s study hall group would likely be assigned to a different permanent location for reasons other than protecting Miss Goodwin.

44.     In or around September 2015, Miss Goodwin's mother spoke with PSD Superintendent Rattigan about PSD's failure to address the ongoing harassment. Rattigan, as the Superintendent of PSD, was also a final policymaker with regard to the training and supervision associated with Title IX and how PSD addresses sexual harassment. Rattigan advised Miss Goodwin's mother to direct any concerns to Principal DeBona instead of Hegen given his continued failure to address Miss Goodwin's complaints.

45.     During the course of her junior year, Miss Goodwin was consistently forced to be in close proximity—such as, study halls, lunch, or assemblies—with her rapist and his friends while PSD continued to fail to investigate or address the harassment in any effective way.

46.     For approximately two weeks after Miss Goodwin's mother's meeting with school administrators about protecting Miss Goodwin from her rapist and harassers, Miss Goodwin was forced to share a study hall location with H., even though he was not in her actual study hall group assignment. In response to Miss Goodwin's mother's multiple emails asking

why the H.'s study hall had not yet been moved to a different location, PHS administrators told her they were working on it – and then failed to follow up as promised with updated information.

47.     PHS and its officials and administrators never removed C., N. or B. from Miss Goodwin's lunch period, where they sat two tables away from her. Rather than eat next to her harassers, Miss Goodwin would often retreat to the library, forced into further isolation from her peers.

48.     Miss Goodwin's mother recognized that, because of PSD's lack of commitment to separating the harassers from her daughter, at times Miss Goodwin and H., N., B., or C. would be in the same space. In hopes of minimizing the damage such unnecessary contact would cause, Miss Goodwin's mother simply requested that Miss Goodwin at least be informed ahead of time. Yet, on numerous occasions, Miss Goodwin found herself, with absolutely no warning, sharing space with one of the boys. For example, in October 2015, Miss Goodwin's World Culture class attended an assembly. H. was also present. This deeply upset Miss Goodwin, particularly because PHS had failed to provide Miss Goodwin with notice that H. would also be at the assembly, which left her unable to prepare herself for the encounter.

49.     That same month, Miss Goodwin heard that H. had thrown a girl to the ground during a "game" of musical chairs at school. Rather than reprimand him, Hegen praised H. for doing so, giving him a high five and thus encouraging his ongoing pattern of violence against female classmates and further discouraging Miss Goodwin from believing that PSD and its administrators would ever provide protection.

50.     Despite Miss Goodwin regularly reporting H., N., B., and C.'s behavior to PHS's officials, including Principal DeBona, as advised by Superintendent Rattigan, they rarely intervened. On the few occasions when they did intervene, it was not reasonably calculated to

end the harassment as evidenced, in part, by the fact that the harassment continued. For example, when Miss Goodwin attended a college fair during spring 2016, she ran into H., who was a senior that had already, presumably, determined his post-high school plans and, for this reason, had already been dismissed from the event. She informed Hegen of H.'s presence. While Hegen did ask H. to leave the premises, H. refused to do so and Hegen took no other action.

51.     Emboldened yet again by the PHS administrators' inaction, H., N., B., and C. intensified their campaign of harassment. Nearly every day, Miss Goodwin was subjected to verbal and physical harassment.

52.     On December 27, 2015, the one-year anniversary of Miss Goodwin's rape, C. sent her a text message asking her to "hang out," a cruel reminder of the sexual assault by C.'s close friend, H. Miss Goodwin's mother reported the harassing message to PSD officials, including Principal DeBona, Superintendent Rattigan, Hegen, and McHale on January 5, 2016. In response, Hegen agreed that the text message was a deliberate act of harassment intended to remind Miss Goodwin of a "horrible day in her life," and yet, PSD took no step to address this harassment.

53.     PSD's refusal to stop the harassment and separate Miss Goodwin from H., B., N., and C. continued to interfere with Miss Goodwin's education and her ability to participate in extracurricular activities and school events. She stopped attending football and basketball games with her friends. Miss Goodwin attended classes only two or three days a week and often left early. Her academic performance declined and her GPA dropped from a 3.9 to a 3.2. Miss Goodwin also resigned from the debate team and Student Council due to her absences. In doing so, Miss Goodwin turned down a nomination to be Student Council president, her dream since grade school.

54.     By spring 2016, Miss Goodwin, feeling fed up, confronted Hegen and asked him why he refused to appropriately end the sexual harassment that she had suffered for over a year. Hegen's response was to suggest that Miss Goodwin leave PHS and attend the alternative school. Miss Goodwin was furious that Hegen treated her as if she deserved expulsion while refusing to punish the boy who had raped her or his friends who continued to harass her.

55.     In early April 2016, C. shoved Miss Goodwin in the hallway. As a result, Miss Goodwin requested that Principal DeBona set up a meeting between Miss Goodwin and C. to discuss the situation. DeBona denied this request because she claimed "this information is confidential."

56.     On April 7, 2016, Miss Goodwin's mother emailed Price and the guidance counselor, Erik Henrysen, noting that Miss Goodwin had missed significant school because of the ongoing verbal and physical harassment. In that email, Miss Goodwin's mother requested that the school coordinate with Miss Goodwin's therapist to accommodate her disability and asked that PHS instruct C. not to interact with Miss Goodwin. Miss Goodwin's mother again mentioned Miss Goodwin's Title IX rights.

57.     Henrysen responded to Miss Goodwin's mother's email. He informed her that he would set up a meeting between Miss Goodwin, C., Principal DeBona, and himself for the following week. Although Miss Goodwin was afraid to sit in a small room with C., given his severe and pervasive harassment of her, she wanted to make sure PHS was, in fact, instructing C. to stay away from her. Given the school's long-running failure to end the abuse, Miss Goodwin reasonably worried that PHS would not so instruct C.

58.     On April 11, 2016, Miss Goodwin met with Principal DeBona, Henrysen, and C. and discovered that her worries were well-founded. Instead of instructing C. to stay away from

13

Miss Goodwin, the school administrators asked Miss Goodwin to explain why she had called the meeting. DeBona stated during the meeting that the meeting "has been a big waste of time, [Miss Goodwin was] in no danger." DeBona concluded the meeting by telling Miss Goodwin and C. that they should *both* do their best to avoid each other, as though the responsibility to stop C.'s harassment was Miss Goodwin's.

59. That day, Miss Goodwin realized she could not handle the harassment any longer. Miss Goodwin's mother emailed PSD officials, including Principal DeBona and Superintendent Rattigan, stating that Miss Goodwin would transfer schools because of PSD's, DeBona's, and Rattigan's failures to address the sexual harassment or accommodate Miss Goodwin's disability. "My heart is broken," Miss Goodwin's mother wrote. She continued that she was "[s]addened that those that I trusted to protect my daughter, looked at HER as wasting their time...leaving her feeling like SHE is the problem."

60. Rather than make efforts to keep Miss Goodwin at PHS, Principal DeBona agreed that Miss Goodwin should transfer schools. In an email response on April 12, DeBona encouraged Miss Goodwin's mother to consider private school, cyber school, and homeschooling.

61. Miss Goodwin spent the rest of the academic year enrolled in an experimental pilot cyber school, taking classes online. As a result, she missed quality, in-person education, extracurricular activities, and social opportunities crucial for a young person's development. Miss Goodwin's studies suffered. Further, because it was a set list of academic courses, Miss Goodwin was unable to take non-academic courses, such as music or art, and was limited to the courses provided, which did not correspond to the classes in which she had enrolled at PHS. As a result, Miss Goodwin could not continue to take honors-level courses, as she had done since

sixth grade, and had to re-take at least one course that she had already completed at PHS, French 2, in order to meet her credit requirements. Once a "straight A" student, Miss Goodwin failed her keystone standardized exam. PHS offered no accommodations based on her disability.

62.     Meanwhile, Miss Goodwin's rapist and harassers graduated from PHS without incident—their educations uninterrupted while their victim was denied an equal opportunity to access her high school education.

63.     At the end of September 2016, Miss Goodwin decided she would re-enroll at PHS to finish her senior year, since her rapist and harassers had graduated. To minimize her time at PHS, she enrolled in a dual program with a local college, Bucks Community College, for her fall semester.

64.     While Miss Goodwin was glad to be back in school, she still struggled with her PTSD and often missed classes.

65.     In October 2016, B. was allowed back into PHS for a military recruiting event. Consistent with past practices, Miss Goodwin was not provided with any warning. Luckily, Miss Goodwin was out of school that day, but knowing that B. had been permitted to show up on the premises left her feeling unsafe. She felt that her harassers or rapist could show up on any day at PHS.

66.     Upset, Miss Goodwin confronted Henrysen, who told her the boys would not be allowed on school premises.

67.     Again, PSD broke its promise. Just a week later, H., Miss Goodwin's rapist, visited PHS for another military recruitment event. He was allowed on campus by David Laboski, an assistant principal. During that time, H. wandered the halls unattended. He even visited a classroom Miss Goodwin would have been in had she not been at an appointment.

68.     Yet again, Miss Goodwin's mother emailed Superintendent Rattigan, Principal DeBona, and other PSD administrators asking why B. and H. were allowed back at PHS. In her messages, Miss Goodwin's mother emphasized the importance of providing Miss Goodwin with a simple warning when the boys' presence could not be avoided. Such notice, Miss Goodwin's mother explained, was crucial for Miss Goodwin to avoid a PTSD trigger. In her email, Miss Goodwin's mother felt the need to inform the school officials that PTSD "is a real thing." "Can someone help me?" Miss Goodwin's mother asked. "Why can't someone care just enough to give us some warning?"

69.     In her reply, Principal DeBona explained that H. had been allowed on campus because Laboski was uninformed that H. was not welcome. DeBona expressed no remorse or concern regarding B.'s presence. Yet again, DeBona promised that PHS would address the ongoing harassment and keep Miss Goodwin safe.

70.     During her senior year, Miss Goodwin learned from local newspapers about another girl, Modupe Williams, who had been harassed based on her race and sex while a student at PHS. PHS had refused to discipline Miss Williams' harassers for the same reason they had provided Miss Goodwin – that some of the harassment had occurred off-campus – and had also encouraged her to drop out of PHS and attend the alternative school.

71.     In or around early May 2017, Miss Goodwin contacted Hegen for assurance that B., who is dating a PHS senior, would not be allowed to attend prom. After promising her multiple times that he would be banned, Principal DeBona called a meeting with Miss Goodwin's mother, which Miss Goodwin attended at her mother's invitation, on May 16, 2017. There, DeBona explained that B. would in fact be able to attend – even though (1) he was no longer a PHS student, (2) he had threated to "jump" Miss Goodwin and otherwise harassed her,

and (3) upon information and belief, he was banned from his own prom because he had *disrespected* a teacher.

72.     Miss Goodwin was devastated; if B. would be at prom, she could not safely and comfortably attend. When Miss Goodwin protested the decision, Principal DeBona told her that B. had "done nothing wrong"; what Miss Goodwin "wants doesn't matter" and "what Darbi feels changes nothing."

73.     That same day, a representative from the National Women's Law Center, which represents Miss Goodwin, called Principal DeBona to discuss the school's obligations to ensure that Miss Goodwin could attend her prom. DeBona did not return a message.

74.     On May 18, 2017, Principal DeBona informed Miss Goodwin that she and B., who is not a PSD student, could attend prom at different times during the night. Miss Goodwin explained that this arrangement would only make matters worse because he would be there and would tell her classmates why he had to leave early. They would then know that she was the reason B. could not attend all of prom and possibly retaliate.

75.     On May 19, 2017, a representative from the National Women's Law Center again left a message with Principal DeBona about Miss Goodwin's ability to attend prom. The representative also left a message for Superintendent Rattigan about the same topic. Neither DeBona nor Rattigan returned the representative's call.

76.     On May 22, 2017, a representative from the National Women's Law Center again called Superintendent Rattigan about Miss Goodwin's ability to attend prom. Rattigan did not accept the phone call but instead instructed the representative to call PSD's solicitor, Robert Cox. The representative immediately did so and left a message for Mr. Cox. He did not return the call.

77.    On May 24, 2017, a representative from the National Women's Law Center sent Mr. Cox an email documenting Miss Goodwin's position that permitting B. to attend prom would create a hostile environment in violation of Title IX.  The email reflects Mr. Cox's stated belief that it would be "unfair" for PSD to bar B., a non-student, from the prom and that PSD had no responsibility to Miss Goodwin to prevent B. from attending. The email noted that Mr. Cox believed that B.—who had threatened to physically assault Miss Goodwin in text messages provided to PSD, DeBona, and Hegen—was an "upstanding member of the community" who had not been criminally convicted. As the email recounted, PSD would allow B. to attend prom despite full knowledge that his presence would create a hostile environment for one of its students.

78.    PSD's deliberate indifference, customs and practices, failure to supervise, and lack of training continue to create a hostile environment for Miss Goodwin even as she approaches her final days at PHS.

79.    Although Miss Goodwin is glad that she is soon leaving PHS, Miss Goodwin knows she has to stand up not only for herself, but for other young PSD victims who have lost or who will lose the chance to learn.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
Violation of Title IX, 20 U.S.C. § 1681(a) – Deliberate Indifference
(Defendant Pennridge School District)

80.    Miss Goodwin incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

81.    Title IX of the Education Amendments of 1972 provides, with certain exceptions, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in,

be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

82.    PSD receives federal financial assistance pursuant to Title IX.

83.    Starting in March 2015, PSD and its officials had actual knowledge of Miss Goodwin's report that H. had raped her and that after the rape during her sophomore year and through her senior year of high school H., B., C., and N. subjected Miss Goodwin to severe and pervasive sexual harassment.

84.    Superintendent Jacqueline Rattigan, Principal Gina DeBona, Assistant Principal Scott Hegen, and Title IX Coordinator Jacqui McHale all knew of the rape and the subsequent harassment and had the authority to take corrective action, but failed to take any steps to address the hostile educational environment or the harassment.

85.    In spite of its knowledge of both the rape and the pervasive harassment and its authority and control over the perpetrators, PSD and its officials failed to investigate the ongoing sexual harassment, discipline the wrongdoers, or provide appropriate accommodations. PSD took no effective steps to address and to stop the sexual harassment or to facilitate Miss Goodwin's continued education.

86.    PSD was thus deliberately indifferent to Miss Goodwin's repeated reports of sexual harassment, despite their authority and ability to address the continued abuse. Their response was clearly unreasonable in light of the known circumstances.

87.    As a result of PSD's deliberate indifference to the sexual harassment, Miss Goodwin, on the basis of her sex, was excluded from participating in, denied the benefits of, and subjected to discrimination in, the PSD's education program in violation of Title IX.

88.     PSD and its officials' deliberate indifference subjected Miss Goodwin to sexual

harassment so severe, pervasive, and objectively offensive that she was denied equal access to

educational opportunities, resources, and benefits. PSD's deliberate indifference caused Miss

Goodwin to miss classes, lose interest in her education, withdraw from participation in

extracurricular activities, and spend her days in fear as she regularly encountered her assailant or

harassers on campus; ultimately, they directly caused her to withdraw from PHS.

89.     As a direct and proximate result of PSD's deliberate indifference, Miss Goodwin

has suffered emotional distress and psychological trauma for which she is entitled to be

compensated

**SECOND CLAIM FOR RELIEF**
Violation of the Right to Equal Protection, Brought Under 42 U.S.C. § 1983
Hostile Environment
(Defendants Pennridge School District, Rattigan, and DeBona)

90.     Miss Goodwin incorporates all preceding paragraphs into this Count by reference

as though fully restated herein.

91.     Defendants PSD, Superintendent Rattigan, and Principal DeBona were at all

relevant times final policymakers and administrators acting under color of law.

92.     Defendants PSD, Superintendent Rattigan, and Principal DeBona maintained a

policy, custom, and practice of (i) refusing to investigate sexual harassment, including sexual

assault, that occurs off-campus and/or does not result in the criminal conviction of the alleged

assailant, even if the assault contributes to an on-campus hostile environment, and (ii)

encouraging victims to leave PHS.

93.     Consistent with its policy and custom, Defendants PSD, Superintendent

Rattigan, and Principal DeBona took no action to investigate the off-campus assault because they

wrongly believed they had no obligation to do so despite its contribution to an on-campus hostile environment that interfered with Miss Goodwin's education.

94.     Defendants PSD, Superintendent Rattigan, and Principal DeBona knew that the harassment was so severe that Miss Goodwin was unable to finish her sophomore year at PHS. Despite this, when she decided to attempt to re-enroll at PHS for her junior year, Defendants again refused to investigate or to address Miss Goodwin's regular reports of sexual harassment. Defendants failed again and again throughout Miss Goodwin's junior year to address the hostile educational environment, even as they saw her participation in extracurricular activities decline, grades drop, and, ultimately, transfer to an experimental cyber school after being encouraged to leave PHS for an alternative school by Hegen. When Miss Goodwin re-enrolled at PHS for her senior year, Defendants again refused to take action to address the harassment, failing even to separate her harassers from her and to ensure she had equal access to educational opportunities.

95.     Defendants' had actual knowledge of the severe, pervasive, and objectively offensive harassment that Miss Goodwin was subjected to on a daily basis and that, pursuant to their policies and customs, Goodwin has been denied equal access to PHS's resources and opportunities, just as these polices and customs have denied others in the past.

96.     For these reasons, Defendants' unwillingness to respond to reports of sexual harassment amounted to deliberate indifference.

97.     Defendants' deliberate indifference to reports of sexual harassment violated Miss Goodwin's substantive due process rights under the Fourteenth Amendment, including equal access to her educational institution's resources and opportunities, freedom from sexual abuse in school, and right to bodily integrity.

98.     As a direct and proximate result of Defendants' actions, inactions, deliberate indifference, and violations of Plaintiff's clearly established Constitutional rights, Miss Goodwin sustained and continues to sustain injuries, including emotional distress and psychological trauma, for which she is entitled to be compensated.

### THIRD CLAIM FOR RELIEF
Violation of the Right to Equal Protection, Brought Under 42 U.S.C. § 1983
Failure to Train
(Defendants Pennridge School District, Rattigan, and DeBona)

99.     Miss Goodwin incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

100.     Defendants PSD, Superintendent Rattigan, and Principal DeBona were at all times relevant policymakers and administrators, acting under color of law, who had a duty to train, and failed to train, administrators, teachers, staff, employees, students, and parents concerning PSD and PHS policies on reporting and addressing on-campus and off-campus sexual harassment of students like Miss Goodwin.

101.     PSD employees were insufficiently and inappropriately advised by Defendants PSD, Superintendent Rattigan, and Principal DeBona on Title IX and school policies regarding the investigation and response to reports of rape and/or sexual harassment, at both the district and school levels. This failure is evidenced by the following:

   a.   Assistant Principal Hegen incorrectly informed Miss Goodwin and Miss Goodwin's mother that PSD could not investigate the alleged rape by H. because it had occurred off-campus.

   b.   PSD and Hegen failed to investigate, as required by federal law and PSD's own school policy, the alleged off-campus assault.

c.  Miss Goodwin's mother had to teach Title IX Coordinator McHale about Title IX's requirements.

d.  Despite her education from Miss Goodwin's mother, McHale repeatedly failed to understand her obligation to Miss Goodwin pursuant to Title IX.

e.  Over the two and a half years that Miss Goodwin sought the school's help, PHS lacked the appropriate training to (i) recognize the need for an investigation into the rape and subsequent harassment, (ii) conduct a proper investigation, or (iii) even appropriately address her harassers' behavior.

f.  The pervasive and continuing harassment increased in severity because of the failure to properly train PSD administrators and staff regarding their Title IX obligations to address sexual harassment.

102.    PSD, Superintendent Rattigan, and Principal DeBona had actual knowledge of their legal obligations, pursuant to Title IX and prior case law, as summarized in administrative guidance including the Dear Colleague Letter, to appropriately train staff on how to respond to and address reports of off- and on-campus sexual harassment and to avoid creating hostile environments within PSD. They also had actual knowledge from past experience at PSD that not training staff to appropriately respond to or address off- and on-campus sexual harassment results in violations of students' substantive due process rights under the Fourteenth Amendment, including, but not limited to, denying students equal access to PSD's educational resources and opportunities.

103.    Given PSD, Superintendent Rattigan, and Principal DeBona's actual knowledge of the need to train PSD staff to appropriately respond to and address reports of off- and on-

campus sexual harassment in order to not violate students' constitutional rights, their failure to do so was unreasonable and amounted to deliberate indifference.

104.    Defendants' failure to adequately train its administrators and staff regarding how to appropriately respond and address claims of sexual harassment at PSD and PHS specifically and directly caused PSD to violate Miss Goodwin's substantive due process rights under the Fourteenth Amendment including equal access to her educational institution's resources and opportunities, freedom from sexual abuse in school, and right to bodily integrity.

105.    As a direct and proximate result of Defendants' inactions and violations of Plaintiff's clearly established Constitutional rights, Miss Goodwin sustained and continues to sustain injuries, including emotional distress and psychological trauma, for which she is entitled to be compensated.

### FOURTH CLAIM FOR RELIEF
Violation of the Right to Equal Protection, Brought Under 42 U.S.C. § 1983
Supervisory Liability
(Defendants Rattigan and DeBona)

106.    Miss Goodwin incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

107.    Defendant Superintendent Rattigan was at all relevant times an employee of Defendant PSD, acting under color of law, who had supervisory duties and responsibilities with respect to her subordinates, including Principal DeBona, Hegen, McHale, Henrysen, and Price.

108.    Defendant Superintendent Rattigan had actual knowledge and/or constructive knowledge, including knowledge she would have had if she used reasonable care or diligence, that her subordinates engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to Plaintiff based on, *inter alia*, the following:

a.  Rattigan's receipt of multiple complaints from Miss Goodwin's mother about Hegen's mishandling of Miss Goodwin's reports of past and ongoing sexual harassment;

b.  Rattigan's admission to Miss Goodwin's mother that Hegen was likely to mishandle reports of further harassment;

c.  Rattigan's inclusion on multiple emails over the course of Miss Goodwin's junior and senior years from Miss Goodwin's mother and PSD administrators discussing Miss Goodwin's continued struggles with harassment at PHS and her decision to withdraw; and

d.  Rattigan's receipt of phone messages and emails from Miss Goodwin's legal representatives informing her of the school's failure to ensure Miss Goodwin could attend prom safely.

109.    Defendant Principal DeBona was at all relevant times an employee of Defendant PSD, acting under color of law, who had supervisory duties and responsibilities with respect to her subordinates, including Hegen, McHale and Henrysen,.

110.    Defendant Principal DeBona had actual knowledge and/or constructive knowledge, including knowledge she would have had if she used reasonable care or diligence, that her subordinates engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to Plaintiff based on, *inter alia*, the following:

a.  DeBona's receipt of multiple complaints from Miss Goodwin's mother about Hegen's mishandling of Miss Goodwin's reports of past and ongoing sexual harassment;

b.  DeBona's inclusion on multiple emails over the course of Miss Goodwin's junior and senior years from Miss Goodwin's mother and PSD administrators discussing Miss Goodwin's continued struggles with harassment at PHS and her decision to withdraw;

c.  DeBona's participation in an April 2016 meeting with Henrysen, C., and Miss Goodwin about PSD's response to C.'s ongoing harassment of Miss Goodwin.

d.  DeBona's knowledge that PHS officials were not adequately informed of PSD's ban of H. on campus after his graduation,  failing to enforce that ban and permitting Miss Goodwin's harassers to also return to school after their graduation;

e.  DeBona's receipt of phone messages and emails from Miss Goodwin's legal representatives informing her of the school's failure to ensure Miss Goodwin could attend prom safely.

111.    Defendants Superintendent Rattigan and Principal DeBona's responses to this actual and constructive knowledge were so inadequate as to show deliberate indifference to or tacit authorization of their subordinates' mistreatment of Miss Goodwin.

112.    Defendants Superintendent Rattigan and Principal DeBona's responses to this actual and constructive knowledge exhibited reckless and/or callous indifference to Plaintiff's federally protected rights.

113.    Defendants Superintendent Rattigan and Principal DeBona took no action to correct their subordinates' refusals to investigate or to take disciplinary action in response to Miss Goodwin's reports of sexual harassment, their refusals to separate H., N., B., and C. from Miss Goodwin, and other failures to ensure Miss Goodwin could remain at PHS.

114.    Further, Defendants Superintendent Rattigan and Principal DeBona maintained a policy, custom, and practice of (i) refusing to respond to reports of sexual harassment that occurred in whole or in part off-campus and/or did not result in criminal convictions, and (ii) encouraging victims to leave PHS. They maintained this policy, custom, and practice, which their employees enacted, with deliberate indifference to the consequences.

115.    Defendants' failure to supervise and their policy, custom, and practice violated Miss Goodwin's, and other students', substantive due process rights under the Fourteenth Amendment including equal access to her educational institution's resources and opportunities, freedom from sexual abuse in school, and right to bodily integrity.

116.    As a direct and proximate result of Defendants' actions, inactions, failure to supervise, policy, custom, practice, and violations of Plaintiff's clearly established Constitutional rights, Miss Goodwin sustained and continues to sustain injuries, including emotional distress and psychological trauma, for which she is entitled to be compensated.

### FIFTH CLAIM FOR RELIEF
Negligence
(Defendant Pennridge School District)

117.    Miss Goodwin incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

118.    Defendant PSD owed statutory, common law, and assumed duties to Miss Goodwin to regulate, supervise, and otherwise provide a reasonably safe high school environment, including protecting her from known individuals who had subjected her to severe, pervasive, and objectively offensive harassment.

119.    PSD breached these duties and was negligent by, among other things:

 a.   failing to have in place or enforce policies to protect students from a sexually hostile environment at PHS;

    b.   failing to investigate reports of sexual harassment by and against its students occurring both on- or off-campus and resulting in a hostile environment;

    c.   failing to discipline PHS student perpetrators of sexual harassment, including H., B., C., and N., thus leaving Miss Goodwin in ongoing proximity to her assailant and harassers;

    d.   failing to warn Miss Goodwin or her mother about upcoming instances where Miss Goodwin would have to share space with her assailant or harassers;

    e.   failing to act reasonably under the circumstances; and

    f.   other negligent and deliberately indifferent conduct.

120.    As a direct and proximate result of PSD's breach of duties, Miss Goodwin sustained and continues to sustain mental and emotional injuries including physical and psychological distress.

121.    PSD has the authority, ability, and responsibility to address sexual harassment as demonstrated by federal law as well as by the rules and policies that effectively maintain order and discipline in other areas of PHS, such as fighting, classroom attendance, cyberbullying, and behaviors that must be addressed in order to permit a high school to function.

122.    As a direct and proximate result of Defendants' actions and inactions, Miss Goodwin sustained and continues to sustain injuries, including emotional distress and psychological trauma, for which she is entitled to be compensated.

## PRAYER FOR RELIEF

Plaintiff, Miss Goodwin, requests that this Court award her:

    A.  Compensatory  damages on Count I;

    B.  Compensatory damages on Count II;

    C.  Compensatory damages on Count III;

    D.   Compensatory damages on Count IV;

    E.   Compensatory Damages on Count V;

    F.   Attorney's fees;

    G.   Declaratory judgment that the Defendant's treatment of Miss Goodwin violated Title IX and the U.S. Constitution;

    H.   Injunctive relief ordering PSD to revise its policies, procedures, and practices so that it is in compliance with Title IX and the U.S. Constitution; and

    I.   Such other and further relief that is just and appropriate under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(b) Plaintiff demands a trial by jury.

Dated:  May 30, 2017

Respectfully submitted,

BY:  /s/  Courtney Saleski

Courtney G. Saleski (Bar No. 90207)
DLA PIPER LLP (US)
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, PA 19103-7300
Telephone: 215.656.2431
E-mail:          Courtney.Saleski@dlapiper.com

Matthew Graves
Katherine M. Ruffing
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, D.C. 20004
Telephone: 202-799-4469
E-mail:          Matthew.Graves@dlapiper.com
                       Katie.Ruffing@dlapiper.com

Neena Chaudhry
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle, Suite 800
Washington, D.C. 20036
Telephone: 202-588-5180
Email:          Neena.Chaudhry@nwlc.org