# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARBIANNE GOODWIN, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PENNRIDGE SCHOOL DISTRICT, et al., | : | NO. 17-2431 |
| Defendants. | : | |

## MEMORANDUM OPINION

**TIMOTHY R. RICE**                                                                   **March 6, 2018**
**U.S. MAGISTRATE JUDGE**

      Defendants Pennridge School District (PSD), Superintendent Jacqueline Rattigan, and Principal Gina DeBona move to dismiss (doc. 10) pursuant to Fed. R. Civ. Pro. 12(b)(6), contending Plaintiff Darbianne Goodwin's Amended Complaint (doc. 8) fails to adequately state claims brought pursuant to 20 U.S.C. § 1681, et seq. ("Title IX"), 42 U.S.C. § 1983, and state law. See Am. Compl. at 19-28. The motion is granted in part and denied in part. Goodwin has stated claims for relief under the federal statutes, but failed to allege conduct sufficiently severe to support a claim for intentional infliction of emotional distress under Pennsylvania law.

## I.     LEGAL STANDARD

Goodwin asserts five claims against various defendants: (1) violation of Title IX (against PSD); (2) violation of § 1983 and the Equal Protection Clause for allowing a hostile environment (against PSD, Rattigan, and DeBona); (3) violation of § 1983 and the Equal Protection Clause for failure to train (against PSD, Rattigan, and DeBona); (4) violation of § 1983 and the Equal Protection Clause for supervisory liability (against Rattigan and DeBona); and (5) intentional infliction of emotional distress (against PSD, Rattigan, and DeBona). Id. at ¶¶ 80-124.

When reviewing a motion to dismiss, I undertake a two-step process; the first is to separate the factual and legal averments. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). The legal statements are then set aside and the facts are analyzed to determine whether they constitute a "plausibl[e]," not merely possible, claim. Robinson v. Family Dollar, Inc., 679 F. App'x 126, 131 (3d Cir. 2017).

I assume all facts pled by the plaintiff are true. Fowler, 578 F.3d at 211 (citing Pryor v. National Collegiate Athletic Association, 288 F.3d 548, 559 (3d Cir. 2002)). Further, I make "all reasonable inferences that can be drawn" from the facts, and "constru[e] them in the light most favorable" to the plaintiff. McDermott v. Clondalkin Grp., Inc., 649 F. App'x 263, 266 (3d Cir. 2016) (citing Foglia v. Renal Ventures Mgmt., LLC, 754 F.3d 153, 154 n.1 (3d Cir. 2014)).

## II. FACTS

During December of her sophomore year at Pennridge High School (PHS), Goodwin was raped by H., a PHS junior, outside school hours and off school grounds. Am. Compl. ¶ 14. Goodwin then discovered H.'s friends had been spreading rumors that she had consented to have sex with multiple PHS students the night of the rape. Id. at ¶ 16. About six weeks after the assault, in February 2015, Goodwin told her mother and therapist about it. Id. at ¶ 17. In March 2015, Goodwin reported the rape to the police, who investigated the incident but never prosecuted it. Id. at ¶ 18. That same month, Goodwin's mother met with Assistant Principal Scott Hegen, the "grade principal" for Goodwin's sophomore class, and reported the rape. Id. at ¶ 19. Hegen told Goodwin's mother that, because the assault took place off campus and H. had not been prosecuted, PHS could not take any disciplinary actions against H. or offer any accommodations to Goodwin. Id.

Hegen's advice to Goodwin's mother was contrary to PSD policy, which specifically authorized the school to investigate reports of off-campus behavior. Id. at ¶ 20. PHS students regularly report harassment that involves off-campus behavior. Id. at ¶ 23. PSD failed to supervise and train its employees regarding its actual off-campus behavior policy, id. at ¶¶ 23-24, and also failed to train its staff and administrators in their obligations under Title IX to address sexual harassment, id. at ¶ 26.

In May 2015, a friend of Goodwin's sent her screen shots of text messages showing that H. and his friends intended to physically harm her. Id. at ¶ 28 (messages from B. stated Goodwin "'is getting jumped' and 'needs to learn her place'"). On another occasion, H. confronted Goodwin in the hallway during school hours using expletives and gender-specific language. Id. at ¶ 29. Goodwin reported the harassment to Hegen and DeBona, who met with Goodwin to discuss the incidents, and then informed H.'s family. Id. at 30. No disciplinary action or remedial plan was undertaken. Id. DeBona has unreviewable authority to resolve harassment complaints. Id. at ¶ 31.

By May 2015, Goodwin was regularly missing classes. Id. at ¶ 32. She submitted a letter to Hegen from her psychiatrist and therapist stating that her absences were due to Post-Traumatic Stress Disorder (PTSD). Id. at ¶ 33. PSD did not propose an individualized education plan or safety plan to accommodate Goodwin's PTSD. Id. at ¶ 34. Goodwin completed her sophomore year at home and returned only for final examinations. Id. at ¶ 35.

In August 2015, Goodwin's mother contacted Hegen and asked PHS to ensure Goodwin's safety at school during the coming year. Id. at ¶ 36. She also asked for the contact information for PSD's Title IX coordinator. Id. at ¶ 37. Hegen did not know who the Title IX coordinator was or what she did. Id. at ¶ 38. After conducting additional research, Hegen

informed Goodwin's mother that the PSD Title IX coordinator was Jacqui McHale, and provided McHale's contact information. Id.

On August 24, 2015, Goodwin's mother emailed McHale, described the harassment Goodwin had endured as well as her reaction, and requested that PHS ensure Goodwin did not share any classes with H. or his friends N., B., and C., who had participated in the harassment. Id. at ¶ 39. She offered to provide McHale copies of the harassing text messages. Id. McHale arranged to meet with Goodwin's mother on September 2, 2015, after Goodwin's junior year had begun. Id. at ¶¶ 40-41. McHale also invited DeBona, Hegen, and Troy Price, the administrator in charge of student affairs. Id. at ¶ 40. DeBona chose not to attend. Id. at ¶ 43. On September 1, 2015, Goodwin's mother sent McHale a timeline of harassment-related events and a powerpoint presentation on Title IX. Id. at ¶ 42.

Goodwin's junior year schedule included a study hall shared with H., and lunch period with N., B., and C. Id. at ¶ 41. At the meeting, the administrators refused to change the schedules of H., N., B., or C. because they were seniors. Id. at ¶ 43. They gave Goodwin the option of removing herself from their classes. Id. They also informed Goodwin's mother that H. would likely be assigned to a different study hall location for unrelated reasons. Id.

That same month, Goodwin's mother spoke with Superintendent Rattigan about the school district's inadequate response to the ongoing harassment. Id. at ¶ 44. Rattigan advised Goodwin's mother to direct her concerns to DeBona. Id. For two weeks after the meeting with administrators, Goodwin shared a study hall with H., even though he was supposed to have been moved to a different location. Id. at ¶ 46. During this time period, Goodwin's mother sent multiple emails asking about the move. Id. Although PSD administrators told her they were working on it, they failed to provide updated information. Id.

4

During her junior year, Goodwin was consistently put in close proximity with H., B., C., and N. during study halls, lunch, and assemblies. Id. at ¶ 45. C., N., and B. were never removed from Goodwin's lunch period, and sat two tables away from her. Id. at ¶ 47. Goodwin would often retreat to the library rather than stay near them, which isolated her from her peers. Id.

Goodwin's mother requested that Goodwin be informed ahead of time if she would be in the same space as her harassers, but PHS regularly failed to provide advance notice. Id. at ¶ 48. One example of this failure occurred in October 2015, during an assembly for Goodwin's World Culture Class. Id.

Also during October 2015, H. threw a female student to the ground during a game of musical chairs. Id. at ¶ 49. Hegen praised H. for this, which Goodwin understood to be part of a pattern of encouraging H.'s violence against female classmates. Id. Goodwin regularly reported behavior of H., N., B., and C. to PHS officials, including DeBona, as Rattigan had advised. Id. at ¶ 50. Nonetheless, PHS officials rarely intervened and, when they did, their actions did not end the harassment. Id. For example, Goodwin and H. attended a college fair during spring 2016. Id. Because he was a senior, H. had no reason to attend the college fair. Id. Goodwin informed Hegen of H.'s presence and Hegen asked H. to leave. Id. When H. refused, Hegen took no further action. Id.

Goodwin was subjected to verbal and physical harassment nearly every day during her junior year. Id. at ¶ 51. On December 27, 2015, the one-year anniversary of Goodwin's rape, C. sent her a harassing text message. Id. at ¶ 52. Goodwin's mother reported the harassment to DeBona, Rattigan, McHale, and Hegen on January 5, 2016. Id. Although Hegen agreed it was a harassing text, PSD took no action. Id.

5

Goodwin withdrew from many activities due to the ongoing harassment, including attending football and basketball games, regularly attending classes, and participating in the debate team and student council. Id. at ¶ 53. Her G.P.A. dropped from a 3.9 to a 3.2. Id. She also turned down a nomination to become student council president. Id.

In spring 2016, Goodwin confronted Hegen about his inadequate response to her harassment. Id. at ¶ 54. He suggested she leave PHS and attend the alternative school, whose student population consisted primarily of expelled students and students with behavioral challenges. Id. at ¶¶ 3, 54.

In early April 2016, C. shoved Goodwin in the hallway. Id. at ¶ 55. Goodwin asked DeBona to set up a meeting with C. Id. DeBona declined because she claimed "this information is confidential." Id. On April 7, 2016, Goodwin's mother emailed the guidance counselor, Erik Henryson, requesting that the school coordinate with Goodwin's therapist to accommodate her PTSD, and asking administrators to instruct C. not to interact with Goodwin. Id. at ¶ 56. Goodwin's mother referenced Goodwin's Title IX rights in this email. Id. Henryson agreed to meet with Goodwin, C., and DeBona. Id. at ¶ 57. During the April 11, 2016 meeting, the administrators asked Goodwin to explain why she had called the meeting. Id. at ¶ 58. DeBona alleged the meeting was a waste of time because Goodwin was in no danger, and concluded the meeting by telling Goodwin and C. to do their best to avoid each other. Id.

That day, Goodwin's mother emailed PSD officials and informed them Goodwin would transfer schools due to the district's failure to address the sexual harassment and/or accommodate Goodwin's PTSD. Id. at ¶ 59. In an email response on April 12, 2016, DeBona encouraged Goodwin's mother to consider private school, cyber school, and homeschooling. Id. at ¶ 60.

Goodwin spent the rest of her junior year enrolled in an experimental pilot cyber school. Id. at ¶ 61. She was unable to take non-academic courses, such as music or art, and was limited to courses that did not correspond to her PHS classes. Id. She could not continue taking honors-level courses, and was required to retake French 2 to meet her credit requirements. Id. Although she had once been a "straight A" student, Goodwin failed her keystone exam. Id. PHS offered no accommodations based on her PTSD. Id.

H., N., B., and C. graduated from PHS in June 2016. Id. at ¶ 62.

At the end of September 2016, Goodwin re-enrolled at PHS for her senior year, after H., N., B., and C. had graduated. Id. at ¶ 63. She enrolled in a dual program with Bucks Community College for her fall semester. Id. She struggled with PTSD and often missed classes. Id.

In October 2016, B. was allowed back into PHS for a military recruiting event. Id. at ¶ 65. PSD did not warn Goodwin ahead of time. Id. Although Goodwin did not see B. when he returned to PHS, she felt unsafe knowing her tormentors could return without notice. Id. Goodwin spoke with Henrysen about B.'s return, and Henrysen told her the harassers would not be allowed on school premises. Id.

One week later, H. visited PHS for another military recruitment event. Id. at ¶ 67. He was let on campus by David Laboski, an assistant principal. Id. H. wandered the halls unattended and visited Goodwin's classroom, although she was not there. Id. Goodwin's mother emailed Rattigan, DeBona, and other administrators, asking why B. and H. had been allowed to return, and requesting advance notice of their presence. Id. at ¶ 68. DeBona explained H. had been allowed on campus because Laboski had not been instructed otherwise. Id. at ¶ 69. DeBona promised PHS would address the harassment and keep Goodwin safe. Id.

During her senior year, Goodwin learned about another girl, M., who had been harassed based on her race and sex while a student at PHS. Id. at ¶ 70. PHS had refused to discipline M.'s harassers because some of the harassment had occurred off-campus, and had also encouraged her to drop out of PHS and attend the alternative school. Id. More recently, Goodwin learned that another classmate was also sexually harassed by her classmates throughout her high school career. Id. Even though the classmate reported the harassment, PHS refused to discipline the harassers and ultimately forced her to transfer to the alternative school. Id.

In early May 2017, Goodwin contacted Hegen to ensure she would not see B., who was dating another PHS senior, at her prom. Id. at ¶ 71. Goodwin was promised multiple times that B. would not be allowed to attend. Id. On May 16, 2017, DeBona met with Goodwin's mother, and informed her that B. would be allowed to attend Goodwin's prom even though he was no longer a PHS student, had harassed Goodwin, and had been banned from his own prom for misconduct toward a teacher. Id. DeBona told Goodwin's mother B. had done nothing wrong, what Goodwin wanted did not matter, and what Goodwin felt changed nothing. Id. at ¶ 72.

On May 16, 2017, a representative from the National Women's Law Center called DeBona to discuss the school's obligation to ensure Goodwin could attend her prom. Id. at ¶ 73. DeBona did not return the call. Id.

On May 18, 2017, DeBona informed Goodwin that she and B. could attend the prom at different times during the night. Id. at ¶ 74. Goodwin contended that this plan would give B. an opportunity to explain to his friends why he had to leave early, setting her up for potential retaliation. Id.

On May 19, 2017, a representative from the National Women's Law Center left another message with DeBona and a message with Rattigan about Goodwin's ability to attend prom. Id. at ¶ 75. Neither returned the call. Id.

On May 22, 2017, when a representative from the National Women's Law Center again called Rattigan, she instructed the representative to call PSD's solicitor, Robert Cox. Id. at ¶ 76. The representative did so immediately, but Cox did not return the call. Id.

On May 24, 2017, a representative from the National Women's Law Center sent Cox an email documenting Goodwin's position that permitting B. to attend prom would create a hostile environment in violation of Title IX. Id. at ¶ 77.

### III. DISCUSSION

1. Title IX claim

To state a claim for Title IX liability, Goodwin must show: (1) PSD received federal funds; (2) she was sexually harassed; (3) PSD had "substantial control" over both the harasser(s) and the context of the harassment; (4) PSD had "actual knowledge" of the harassment; (5) PSD was "deliberately indifferent" to the harassment; and (6) the harassment was "so severe, pervasive, and objectively offensive" that it deprived Goodwin of access to educational opportunities or benefits. Davis v. Monroe Cty. Bd. Of Educ., 526 U.S. 629, 650 (1999).

Defendants contest only the last two elements. Def. Br. at 6. They claim Goodwin's allegations concern only four incidents over a two-year period, and are limited to complaints that the harassers were in proximity to her, or "in proximity to a place she was supposed to be, but wasn't." Id. at 7.

I disagree. Although the Amended Complaint includes a limited number of illustrative examples of harassment, it also alleges Goodwin was subject to verbal and physical harassment

9

"nearly every day" during her junior year. Am. Compl. ¶ 51. Drawing all reasonable inferences in Goodwin's favor, Defendants exacerbated the hostile environment when they continued to allow Goodwin's harassers to be near her. Wills v. Brown Univ., 184 F.3d 20, 37 (1st Cir. 1999) ("the continuing presence of the harasser may so alter the terms and conditions of education that the victim of harassment may be able to establish a claim for sex discrimination"); see also Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 718 (3d Cir. 1997) ("in some cases the mere presence of an employee who has engaged in particularly severe or pervasive harassment can create a hostile working environment"); McGuinn-Rowe v. Foster's Daily Democrat, No. 94623-SD, 1997 WL 669965, at *3 (D.N.H. July 10, 1997) ("in cases involving particularly egregious or pervasive harassment, the mere presence of the harasser in the workplace may lend support to a claim for actionable sexual harassment").

Defendants also argue Goodwin has failed to show deliberate indifference because the actions taken by the school district were not "clearly unreasonable." Def. Br. at 7 (citing Davis, 526 U.S. at 648). They list 12 actions taken in response to Goodwin's complaints: (1) holding a March 2015 meeting with Goodwin's mother; (2) meeting with Goodwin to discuss text messages and verbal harassment; (3) informing H.'s family of the harassment allegations; (4) speaking with Goodwin's mother in August 2015 about the Title IX coordinator; (5) conducting additional research to provide Goodwin's mother with the contact information for PSD's Title IX coordinator; (6) replying to Goodwin's mother's request for an August 25, 2015 meeting; (7) meeting with Goodwin's mother on September 2, 2015; (8) discussing changing student schedules with Goodwin's mother, and ultimately moving H.'s study hall; (9) responding to inquiries regarding moving H.'s study hall; (10) meeting with Goodwin and C. and instructing them to avoid each other; (11) addressing Goodwin's concerns when B. and H. were mistakenly

10

allowed back onto campus after graduation; and (12) discussing B.'s prom attendance with Goodwin and suggesting an arrangement in which Goodwin and B. attend at separate times. Def. Br. at 8-9.

None of these actions were effective in preventing Goodwin from experiencing further harassment. See Am. Compl. ¶¶ 17-74. Failing to undertake new measures when an initial approach has failed is sufficient to show deliberate indifference. S.K. v. N. Allegheny Sch. Dist., 168 F. Supp. 3d 786, 802 (W.D. Pa. 2016). Viewing the facts in the light most favorable to Goodwin, McDermott, 649 F. App'x at 266, defendants' responses did not address the harassment, and in some cases were not even designed to do so.

For example, Defendants cite the March 15 meeting held with Goodwin's mother as evidence of their reasonable response. Def. Br. at 8. At that meeting, however, Hegen told Goodwin's mother, in contravention of PSD's own policy, that no investigation or discipline could be imposed on H. because the sexual assault took place off campus. Am. Compl. ¶ 19. Defendants also list the meeting they held with Goodwin regarding the verbal harassment and physically threatening text messages. Def. Br. at 8. After this meeting, however, during which Goodwin showed Defendants screen shots of threats against her, the defendants took no disciplinary action. Am. Compl. ¶¶ 28-30. Instead, the Amended Complaint alleges, they told H.'s family of the harassment allegations. Id. at ¶ 30.

Defendants contend their response was not "clearly unreasonable" because Hegen spoke with Goodwin's mother about the Title IX coordinator in August 2015. Def. Br. at 8. But when Goodwin's mother first asked for the name of the Title IX coordinator, Hegen had no idea who held that position or what it entailed. Am. Compl. ¶ 38. Defendants cite Hegen's research to identify PSD's Title IX coordinator as additional evidence that its response to Goodwin's

11

complaints was not "clearly unreasonable." Def. Br. at 8. Viewed in a light most favorable to Goodwin, however, it is "clearly unreasonable" for an agent in Hegen's position of principal to be ignorant of Title IX and which school official had enforcement responsibility for it. See infra, § 3 (failure to train claim).

Similarly, Defendants claimed they took four actions in response to Goodwin's mother's request for a meeting in August 2015: (1) responding to the request; (2) holding the meeting; (3) discussing changing student schedules and ultimately changing one student's study hall; and (4) responding to inquiries about moving the study hall. Def. Br. at 8. As alleged in the Amended Complaint, however, Goodwin's mother requested reassurances about the upcoming school year. Am. Compl. ¶¶ 36-39. Defendants scheduled a meeting with her for a day after the school year had already begun, and refused to take any action except for changing one study hall that was not changed for Goodwin's benefit. Id. at ¶¶ 40-43. Moreover, defendants took so long to implement that one change that Goodwin's mother was required to make multiple inquiries about when it would take place. Id. at ¶ 46.

Defendants also contend their actions were not "clearly unreasonable" because they met with Goodwin and C. and instructed them to avoid each other. Def. Br. at 8. This meeting, however, was supposed to address Goodwin's complaint that C. shoved her in the hall. Am. Compl. ¶¶ 55-57. Viewed in the light most favorable to Goodwin, it is unreasonable for defendants to blame Goodwin for C.'s assault.

Defendants state they addressed Goodwin's concerns when B. and H. were mistakenly allowed back on campus after graduating. Def. Br. at 9. The Amended Complaint alleges the opposite: that PSD failed to address Goodwin's concerns, instead repeatedly telling her they

would keep her harassers from campus without taking reasonable measures to do so. Am. Compl. ¶¶ 65-69.

Finally, Defendants note they suggested an "arrangement" in which both Goodwin and B. could attend her prom at separate times. Def. Br. at 9. The Amended Complaint acknowledges Defendants' suggestion, but also alleges that B. was not a student by this point, and that this would have deprived Goodwin of half her prom while also potentially subjecting her to further retaliation by B.'s friends because B. was required to leave the prom early. Am. Compl. ¶¶ 71-74.

Goodwin has set forth facts that a reasonable jury could find showed "deliberate indifference" to her harassment as well as harassment "so severe, pervasive, and objectively offensive" that it deprived her of educational benefits. Davis, 526 U.S. at 650.

**§ 1983 Equal Protection Claims**

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that a person acting under color of state law engaged in conduct that violated a right protected by the Constitution or laws of the United States." A.G. v. Chester Upland Sch. Dist., 655 F. App'x 125, 127 (3d Cir. 2016) (citing Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000) (en banc)).

Goodwin contends Defendants violated her constitutional rights under the Equal Protection Clause, citing § 1983 and a variety of legal theories. Am. Compl. ¶¶ 90 – 116. Defendants argue Goodwin's Title IX claim subsumes her constitutional claims. Def. Br. at 10. I disagree. See Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 258 (2009) (Title IX claims do not subsume constitutional discrimination claims). Goodwin may proceed with both her Title IX and §1983 claims.

Further, Defendants were all "acting under color of state law." Black by Black v. Indiana Area School Dist., 985 F.2d 707, 714 (3d Cir. 1993) (Scirica, J., concurring). Thus, for each claim, I address only whether Goodwin has stated facts sufficient to support the other elements of her legal theory.

2. § 1983 Hostile Environment Equal Protection Claim

To state a claim for hostile educational environment in violation of the Equal Protection Clause, Goodwin must allege the same elements required for Title IX liability, except she also "must show that the harassment was the result of municipal custom, policy, or practice." Fitzgerald, 555 U.S. at 257-58 (citing Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 694 (1978)). Goodwin brings this claim against PSD, Rattigan, and DeBona.

Defendants argue this claim fails because: (1) plaintiff cited no similarly-situated male; and (2) there is no allegation of intentional discrimination. Def. Br. at 10.

Goodwin was not required to reference a similarly-situated male, because she alleged the harassment was sexual in nature. Moody v. Atl. City Bd. Of Educ., 870 F.3d 206, 214 (3d Cir. 2017); see also Am. Compl. ¶ 29 (allegations of gender-specific harassment). Although there may be some dispute over the reasons for the harassment,[1] viewing all facts in the light most favorable to Goodwin, I must credit Goodwin's allegation that the harassment was sexual in nature, and therefore Goodwin's claim does not fail for lack of a similarly-situated male.

Further, for the purposes of an Equal Protection claim, showing "deliberate indifference" to harassment by a school or "any third party under its control" is sufficient to demonstrate intentional discrimination. Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 294 (3d Cir. 2014) (citing Davis, 526 U.S. at 646-67). Goodwin has pled PSD maintained a "custom or practice" of

---

[1] Defendants appear to suggest the harassers targeted Goodwin because they believed she had reported their participation in a burglary to authorities. See Def. Br. at 6.

failing to address sexual harassment despite a formal policy to the contrary, by stating: Hegen incorrectly informed Goodwin's mother PSD had a policy against investigating or disciplining reports of off-campus harassment (Am. Compl. ¶ 22); PSD failed to supervise and/or train its employees in its actual policy (id. at ¶ 23-26); Hegen did not know who PSD's Title IX coordinator was or what she did (id. at ¶ 38); Hegen encouraged H.'s pattern of violence against female classmates (id. at ¶ 49); Hegen did not make reasonable efforts to enforce accommodations, for example by taking no further action after H. refused to leave a college fair Goodwin was attending (id. at ¶ 50); Hegen suggested Goodwin attend the alternative school when she confronted him about his inadequate responses to her harassment (id. at ¶ 54); DeBona encouraged Goodwin's mother to consider private school, cyber school, and homeschooling when she complained about the district's failure to address the harassment (id. at ¶ 60); Assistant Principal Laboski allowed H. to wander the halls of PHS unattended after he had graduated because he was not informed PSD had any responsibility to protect Goodwin from H. (id. at ¶ 69); and Goodwin learned of two other female classmates who were encouraged to drop out and attend the alternative school when they reported on-campus harassment to PSD administrators (id. at ¶ 70). Such allegations of actions by PSD's authorized agents are sufficient to plead a custom or practice of failing to address complaints of harassment against PSD.

As to Rattigan, Goodwin alleges she is a "final policymaker," with power over "a number of matters, including expulsions for repeated physical assaults and aggressive behavior." Id. at ¶ 10. Further, the Amended Complaint alleges that Goodwin's mother spoke with Rattigan in September 2015 about PSD's failure to address the ongoing harassment, and Rattigan referred the concerns to DeBona. Id. at ¶ 44. Thus, as of September 2015, Rattigan knew about both the ongoing harassment, and Hegen's failure to address it. Goodwin further alleges that PSD took

15

no action after Goodwin's mother specifically informed Rattigan in January 2016 of a harassing text message Goodwin received on the anniversary of her rape. Id. at ¶ 52. On April 11, 2016, Rattigan was informed that Goodwin would leave the high school due to PSD's failure to address the ongoing harassment. Id. at ¶ 59.

When B. and then H. were let back onto campus the following October without advance notice to Goodwin, Goodwin's mother again informed Rattigan. Id. at ¶ 68. When Goodwin was concerned that PHS's plan to allow her to attend her prom would put her in danger of retaliation by B., Rattigan ignored repeated calls from the National Women's Law Center to discuss Goodwin's rights with respect to the extracurricular activity. Id. at ¶ 75-76.

Those allegations are sufficient to state a claim that Rattigan had a "custom or practice" of failing to address Goodwin's harassment complaints.

Finally, Goodwin alleges DeBona had "unreviewable discretion . . . in reviewing harassment complaints," id. at ¶ 11, and Rattigan's direction to Goodwin's mother to speak with DeBona after complaints to Hegen had gone unanswered further suggests DeBona was authorized to address the ongoing harassment, id. at ¶ 44. DeBona was informed about C.'s texts to Goodwin on the anniversary of her rape, id. at ¶ 52, as well as C. assaulting Goodwin in the hallway in early April 2016, but declined to meet with Goodwin and C., claiming her decision was justified by "confidentiality," id. at ¶ 55. Once Goodwin was able to obtain a meeting through guidance counselor Henryson, DeBona told Goodwin it had been "a big waste of time," and simply directed both Goodwin and C. to avoid one another. Id. at ¶ 58.

When Goodwin decided to leave PHS, DeBona encouraged Goodwin's mother to consider private school, cyber school, and homeschooling. Id. at ¶ 60. When Goodwin returned the following fall and B. and then H. were allowed on campus without notice, DeBona informed

16

Goodwin that H. had been allowed on campus because an assistant principal had not been informed otherwise. Id. at ¶ 69. When Goodwin and her mother inquired to Hegen about whether B. would be allowed to attend Goodwin's prom, DeBona told Goodwin's mother B. could attend because he had "done nothing wrong," and Goodwin's preferences and feelings were irrelevant. Id. at ¶ 72. DeBona then failed to respond when Goodwin's representatives from the National Women's Law Center reached out to discuss PSD's Title IX obligations. Id. at ¶¶ 74-75. Those allegations are sufficient to show DeBona had a "custom or practice" of failing to investigate and/or address complaints of sexual harassment.

    3. § 1983 Failure to Train Equal Protection Claim

To assert a "failure to train" claim, the failure must "amount[] to deliberate indifference" to constitutional rights. Woloszyn v. County of Lawrence, 396 F.3d 314, 324 (3d Cir. 2005). Moreover, "a plaintiff asserting a failure to train theory is 'required to prove that the deficiency in training actually caused the constitutional violation.'" Id. at 325 (quoting City of Canton v. Harris, 489 U.S. 378, 391 (1989)). A plaintiff can state a claim against a municipal entity by showing a municipal custom or policy resulted in the failure to train. Branch v. Callis, No. 12-4596, 2013 WL 592273, at *3 (E.D. Pa. Jan. 18, 2013), report and recommendation approved, 2013 WL 609446 (E.D. Pa. Feb. 14, 2013).

Goodwin asserts that PSD has both a legal obligation and a formal policy requiring it to investigate reports of harassment even when they occur off campus. Am. Compl. ¶ 20. Thus, each allegation that responsible administrators were unaware of this policy or regularly failed to implement it supports Goodwin's failure to train claim. See Thomas v. Cumberland Cty., 749 F.3d 217, 225 (3d Cir. 2014) (a "pattern of violations . . . [is] relevant to whether [plaintiff's] injury was a 'highly predictable consequence' of the failure to train").

17

Hegen initially informed Goodwin's mother that PSD had a policy of not investigating complaints of off-campus harassment. Am. Compl. ¶ 19. Despite PSD's actual policy to the contrary, administrators took no disciplinary action when they learned of the harassment. Id. at ¶ 30. Further, Hegen was initially unaware of who PSD's Title IX coordinator was or what her responsibilities were. Id. at ¶ 38. When Goodwin's mother met with the Title IX coordinator in September 2015, PSD still refused to take any steps to separate Goodwin and her harassers. Id. at ¶ 43. When C. sent Goodwin a harassing text message on the anniversary of her rape, PSD again failed to take any action. Id. at ¶ 52. Even after Goodwin had been told that her harassers would no longer be allowed back on campus after they had graduated, H. was allowed to wander the halls unaccompanied because responsible administrators were not instructed to keep him out. Id. at ¶ 69. Finally, when Goodwin requested assurances that B. would not attend her prom, she was initially denied, then offered an accommodation that put her at risk of retaliation, and then, again, denied. Id. at ¶¶ 72, 74, 77.

Those allegations are sufficient to state a claim that PSD failed to adequately train its administrators in its legal obligations to prevent sexual harassment.

4. § 1983 Supervisory Liability Equal Protection Claim

To assert a §1983 claim based on supervisory liability, a plaintiff must show more than respondeat superior or vicarious liability. City of Canton, 489 U.S. at 385. The plaintiff must show "some affirmative conduct by the supervisor." Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990) (citing Rizzo v. Goode, 423 U.S. 362, 377 (1976)). That affirmative conduct, however, can include "acquiescence" to the conduct of a subordinate. Id. (citing Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988)). Goodwin directs this claim against Rattigan and DeBona.

18

The same allegations that show Rattigan knew about, and failed to correct, Hegen's and DeBona's ineffectiveness show she acquiesced in their conduct. See Am. Compl. ¶¶ 42, 52, 59, 68, 75-76. The allegations against DeBona include her failure to demand effective action from Hegen, as well as her own repeated failures to substantially address Goodwin's complaints, such as when she declined to attend the September 2015 meeting with PSD's Title IX coordinator, and informed Goodwin that B. had done "nothing wrong," despite his text messages stating Goodwin was "getting jumped" and "need[ed] to learn her place." Id. at ¶¶ 28, 43, 72. Goodwin has sufficiently pled claims of supervisory liability against Rattigan and DeBona.

5. Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress under state law, plaintiff must show "extreme and outrageous conduct" that intentionally caused her "severe emotional distress." Hoy v. Angelone, 720 A.2d 745, 753 (Pa. 1998). Goodwin's burden is substantial and difficult to meet. The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Id. at 754. Examples of such conduct include killing and burying a plaintiff's son in a field, fabricating records to get another plaintiff indicted for homicide, and lying to the press that a third plaintiff was suffering from a fatal disease. Id.

The conduct alleged in this case, even seen in the light most favorable to Goodwin, fails to exceed the bounds of decency or be intolerable in a civilized society. Id. Goodwin seeks to bring her intentional infliction of emotional distress claim against the school district, superintendent, and principal, not against the harassers themselves. Even at their most egregious, defendants' alleged actions show failure to protect Goodwin from outrageous conduct, not outrageous conduct itself. See Brown v. Muhlenberg Twp., 269 F.3d 205, 219, n.8

19

(3d Cir. 2001) (permitting claim of intentional infliction of emotional distress to go forward against officer who, without justification and after time for reflection, shot and killed pet owner's pet in front of him, but dismissing claim against that officer's supervisors).

An appropriate Order follows.