**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DARBIANNE GOODWIN, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PENNRIDGE SCHOOL DISTRICT, et al., | : | NO. 17-2431 |
| Defendants. | : | |

## MEMORANDUM OPINION

**TIMOTHY R. RICE**                                                                 **May 31, 2019**
**U.S. MAGISTRATE JUDGE**

Plaintiff Darbianne Goodwin claims Defendants Pennridge School District ("PSD"),
Superintendent Jacqueline Rattigan, and Principal Gina DeBona (collectively, "Pennridge
Defendants") deprived her of equal access to an education, as required by 20 U.S.C. § 1681(a)
("Title IX") and 42 U.S.C. § 1983, by failing to adequately address her allegations of sexual
harassment. See Am. Compl. (doc. 8). Pennridge Defendants seek summary judgment on all
four claims: (1) a Title IX claim against PSD; (2) a § 1983 equal protection claim against
Pennridge Defendants; (3) a § 1983 failure to train claim against Pennridge Defendants; and (4) a
§ 1983 supervisory liability claim against Rattigan and DeBona. Def. Mem. (doc. 94) at 23-52.
Goodwin opposes Defendants' motion, Pl. Resp. (doc. 112), and moves for summary judgment
in her favor on Claims 3 and 4, Pl. Mem. (doc. 96-1) at 1.

This case presents difficult issues involving a high school's obligation under federal law
to prevent student-on-student sexual harassment when the students' interactions transcend the
school day and continue outside of the academic setting. The legal boundaries are even more
challenging for both students and administrators to navigate in the evolving arena of Title IX,
which Congress enacted to ensure that students enjoy full access to educational opportunities and
benefits.

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material facts exists when "factual issues . . . may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). I must view the facts and draw inferences in the light most favorable to the nonmoving party. See Burton v. Teleflex Inc., 707 F.3d 417, 425 (3d Cir. 2013). Cross-motions must be considered "separately, drawing inferences against each movant in turn." Alford v. Hartford Life Ins. Co., No. 07-4527, 2008 WL 2329101, at *3 (E.D. Pa. June 3, 2008). I also may not make credibility determinations or weigh the evidence. Anderson, 477 U.S. at 255.

Defendants' motion is granted in part and Plaintiff's motion is denied. Viewed in the light most favorable to Goodwin, a reasonable jury could return a verdict in her favor on Counts 1 and 3. Goodwin, however, has failed to show how she was injured by the customs and policies she identified in Counts 2 and 4. Summary judgment is granted on both claims.

## I.      Facts in the Light Most Favorable to Goodwin[1]

In December 2014, Goodwin was a sophomore at Pennridge High School ("PHS"). PSOF ¶ 2. H. and his friends N., B., and C. were all juniors. Id. ¶ 9. Goodwin claims she was raped by H. over Christmas break of her sophomore year.[2] Def. Ex. 5.

---

[1]      These facts come from Plaintiff's Statement of Undisputed Facts (doc. 104) ("PSOF") and Defendants' response (doc. 111), as well as Defendants' Statement of Undisputed Facts (doc. 95) ("DSOF") and Plaintiff's response (doc. 113). The documented chronology of events is undisputed. The material details and interpretation of events are disputed. I therefore set forth one narrative, viewed in the light most favorable to Goodwin, and include references to the undisputed documentary evidence, i.e., the exhibits attached to Defendants' or Plaintiff's Statements of Undisputed Facts, when available.

[2]      PSD disputes that the oral sexual assault Goodwin described to police qualifies as rape. Def. Mem. at 7. However, under Pennsylvania law, "rape" is defined as forced "sexual intercourse," 18 Pa. C.S. § 3121, and "sexual intercourse" includes "intercourse per os," 18 Pa.

PHS was administratively structured so that Goodwin's assistant principal was Scott Hegen, while the assistant principal for H., N., B., and C. was David Laboski. Id. ¶¶ 7-8. Principal DeBona had delegated responsibility for investigating disciplinary issues and imposing discipline to Hegen and Laboski. Id. ¶ 6. Although Hegen could participate in an investigation of an incident reported to him by Goodwin about H., N., B., or C., Laboski had responsibility for interviewing and ultimately imposing any discipline on H., N., B., or C. Laboski Dep. at 51-53. Guidance counselors sometimes interviewed students in disciplinary investigations, but never disciplined students. Henrysen Dep. at 59-60.

When Goodwin returned to school after Christmas break, H. and his friends N., B., and C. spread rumors that she had voluntarily slept with multiple boys on the night of the alleged rape. Goodwin Dep. at 65. In response to the trauma of the attack and the repeated traumas of being called a "slut," Goodwin became depressed, anxious, and began cutting herself. Axe Dep. at 49. Goodwin began therapy and told her therapist about the rape on February 10, 2015. Id. at 259, 268. He immediately reported the rape to child services and directed Goodwin to disclose it to her mother. Id.

Although the rape was reported to authorities, an investigation was not immediately undertaken. Goodwin Dep. at 50. On March 13, 2015, Goodwin reported the rape to Peter Cortazzo, her guidance counselor. PSOF ¶ 10. He immediately reported the rape to his supervisor, Hegen, who verified that Goodwin had reported the rape to police before meeting with her. Def. Ex. 26.

Even after Hegen verified Goodwin's police report, and after Goodwin explained the trauma and the ongoing harassment to Cortazzo, PSD made no safety accommodations for at

---

C.S. § 3101. Commonwealth v. Brown, 159 A.3d 531, 534 (Pa. Super. 2017) (forced intercourse per os, i.e., oral sex, is rape).

least two weeks. On March 31, 2015, Goodwin's mother requested that Cortazzo "make teachers aware" of Goodwin's "situation," prompting Cortazzo to email Goodwin's teachers and ask them to allow Goodwin to leave class without explanation if she experienced anxiety. Def. Ex. 29-30.

H. avoided a police interview for several weeks, during which time Goodwin's anxiety increased. Def. Ex. 5. On April 6, 2015, H. spoke with police and gave his version of events, which largely comported with Goodwin's account. Def. Ex. 5. H. agreed that Goodwin repeatedly said no and tried to stop the sexual activity, and that he physically moved her head to resume the activities she had declined. Id. Their stories diverged in that H. said he observed no bleeding or bruising and insisted the sexual activity was consensual, despite Goodwin's attempt to stop it. Id. H. later told Laboski he had not raped Goodwin. Laboski Dep. at 134. Laboski accepted this answer and did not discipline H. Id. at 132-36.

PSD's only other accommodation for Goodwin was to allow her extra time between her third and fourth period classes to avoid seeing H. in the hallways, Def. Ex. 31. On April 21, 2015, Goodwin was in tears in the guidance office, Def. Ex. 30, after reporting to Cortazzo that H. had been boasting about sexually assaulting girls, and that she could "feel" his presence at school, id.

On May 20, 2015, Goodwin confronted B. in the lunch room, demanding that he stop spreading rumors that she was a "slut" and had "snitched" on him and his friends. Goodwin Dep. at 85; Def. Ex. 41. Later, in a text to his girlfriend, B. threatened to "jump" Goodwin so she would "learn her place." Def. Ex. 40. B.'s girlfriend forwarded the text to Goodwin, id., who told Hegen, Def. Ex. 46. Laboski suspended B. from school for three days, and reported the threat to police. Def. Exs. 46, 48.

On May 27, 2015, B.'s first day back in school after his out-of-school suspension, Goodwin had a panic attack and left school. Def. Ex. 30. On June 1, 2015, Goodwin's mother informed PHS that mental health issues precluded Goodwin from returning to school, and asked that Goodwin be allowed to complete schoolwork for the year at home and take her finals. Def. Ex. 34. Hegen rejected the request. He claimed that Goodwin's absence would require a doctor's note and said she would need alternative, homebound instruction and would not be permitted to continue her classwork from home. Def. Ex. 35. Goodwin's mother obtained a note from Goodwin's nurse practitioner, and Goodwin's attendance was excused on June 5, 2015. Def. Ex. 37. Hegen then began assisting Goodwin in obtaining schoolwork from her teachers. Id.

In July 2015, Goodwin received a text from N., who was with B. and C., accusing Goodwin of snitching on them. Goodwin Dep. at 102-03. N. called Goodwin "redickulous," and noted he had chosen this spelling because she was a "hoe" and a "cunt." Def. Ex. 49. Goodwin's mother reported the threat to police. Goodwin Dep. at 104.

On August 18, 2015, Goodwin's mother emailed Hegen and asked for the name of PSD's Title IX coordinator. Def. Ex. 52. She explained Goodwin had been receiving "threats" and "bullying text messages," and requested that H., N., B., and C. not be put in Goodwin's lunch or gym classes. Def. Ex. 52. Hegen was unable to identify the Title IX coordinator without further research. Def. Ex. 53. Moreover, he suggested to DeBona that Title IX protection may not apply to Goodwin because criminal charges had not been filed. Id.

On August 24, 2015, Goodwin's mother informed Title IX coordinator Jacqui McHale about Goodwin's harassment by H., N., B., and C., including that the boys had spread rumors about Goodwin's sexual history in January and February 2015. Def. Ex. 54.

On August 31, 2015, the first day of Goodwin's junior year, she shared a lunch period with N., B., and C. PSOF ¶ 38. Hegen erroneously advised McHale, DeBona, and district administrator Troy Price that Goodwin's mother "did not provide [him] with the names" of the boys. Def. Ex. 54. That day, Goodwin, DeBona, and Hegen met and called Goodwin's mother to outline three options for accommodating Goodwin during the lunch period: (1) change her lunch period; (2) eat elsewhere; or (3) remain in the lunch period with N., B., and C., and supervising personnel would monitor the situation. Def. Ex. 50. Goodwin and her mother were dissatisfied with the options, Pl. Ex. 37, and arranged to meet with McHale on September 2, 2015, Def. Ex. 55. Before the meeting, Goodwin's mother sent McHale a powerpoint presentation outlining Title IX's requirements and a timeline of events that included the sexual rumors the boys had been spreading about Goodwin in January/February 2015. Pl. Ex. 17; Def. Ex. 55.

At the September 2, 2015 meeting, Goodwin informed DeBona, Hegen, Henrysen, and Price that she was encountering H. in the hallways "three times a week." Pl. Ex. 42. She was offered only the same three accommodation options. Def. Ex. 58. Administrators explained that lunch was "usually excluded as a separation area." Def. Ex. 57. Goodwin was assured, however, that N., B., and C. were on "zero tolerance," Pl. Ex. 42, that H.'s counselor had been made aware of her return to school, and had directed H. to "stay away" from Goodwin, Pl. Ex. 46. Goodwin reported she spent most lunch periods by herself in the library or other areas because she was intimidated by her harassers. Goodwin Dep. at 152. Goodwin's mother requested that she and Goodwin be informed in advance if Goodwin was going to encounter the boys. Def. Exs. 42, 46, 57-58.

Six days later, on September 8, 2015, Goodwin found she was scheduled for a study hall

in the cafeteria with H.  PSOF ¶ 40.  Her mother immediately emailed the administrative team.

Def. Ex. 60.  Goodwin's guidance counselor, Henrysen, explained that Goodwin and H. had been

placed in different study hall sections, with different teachers, but unfortunately, both sections

had been located into the cafeteria.  Id.  He pledged a resolution of the scheduling issue.  Id.

The following day, Goodwin was in study hall with B.  PSOF ¶ 40.  Goodwin's mother

again emailed the administrative team, and Price responded that they were working on moving

the boys' study halls out of the cafeteria.  Def. Ex. 62.  He instructed someone from the

administrative team to respond to Goodwin's mother when the schedule had been sorted out.

Def. Ex. 61.  No one contacted Goodwin or her mother.  When Goodwin's mother emailed a

week later, Hegen said the school had moved the boys' study hall sections from the cafeteria.

Def. Ex. 63.  Hegen told Goodwin, however, that the boys were not moved to accommodate her

concerns, but for an unrelated reason.  Goodwin Dep. at 146.  He did not explain until later that

H. and B. would maintain access to the cafeteria, where Goodwin's class was located, because

they had a "right to . . . get breakfast."  PSOF ¶ 42.  Price instructed Goodwin and her mother to

contact DeBona directly with any further Title IX accommodation issues.  Goodwin Dep. at 214.

On September 17, 2015, following these unexpected encounters with H. and his friends,

Goodwin's PTSD was rated "severe" by her medical providers.  Pl. Ex. 43.

On October 15, 2015, Goodwin reported to the auditorium for a mandatory assembly.

Hegen Dep. at 250-52.  H. also attended.  DeBona Dep. at 295.  When Goodwin saw H., Hegen

Dep. at 250-52, she immediately went to the administrative offices, Def. Ex. 77, where Hegen

and DeBona informed her that nothing could be done to accommodate her, id.  Henrysen

attended the assembly with her.  Id.

The next day, Goodwin's mother complained about H.'s unexpected presence at the

assembly and the administrators' lack of sensitivity to Goodwin's fears. Def. Ex. 78. A week later, Goodwin's mother again complained that Hegen was insensitive to female students in general, and cited an incident Goodwin had heard about from other students in which Hegen rewarded H. with a "high five" after he pushed another girl off a chair during a game of "musical chairs." Def. Ex. 78.

On November 19, 2015, H. and Goodwin passed on a staircase. Def. Ex. 79. Goodwin said to her friend, "speak of the devil," and H. told his friends that Goodwin was a "f*cking b*tch." Id. Goodwin reported this incident in writing to Henrysen and Hegen. Id. H. was not asked to submit a written report, and no other witnesses' accounts were solicited. Laboski Dep. at 160. When interviewed by Laboski, H. admitted using foul language. Id. Although the PHS Handbook permitted discipline, Pl. Ex. 15, H. received none, Laboski Dep. at 160. When Henrysen noted that Goodwin's mother was likely to follow up on the incident, DeBona commented that Goodwin's mother was "not privy to the outcome. She only needs to know it's handled." Def. Ex. 80. Laboski assured H. that the interaction was not H.'s fault, and counseled him to stay away from Goodwin for his own good. H. Dep. at 102.

On January 4, 2016, Goodwin informed Henrysen that she had received a text from C. near the anniversary of the alleged rape, asking her to "hang out." Def. Ex. 82. Hegen did not recommend moving C. out of the lunch period he shared with Goodwin because there had been no "face to face issue." Def. Ex. 81. Laboski spoke with C., C.'s parents, and C.'s probation officer, and instructed C. to delete Goodwin's contact information from his phone. Def. Ex. 85.

Goodwin continued to endure daily "very obvious teasing, pointing, [and] laughing" by H., N., B., and C. Goodwin Dep. at 122. On April 5, 2016, C.'s and Goodwin's shoulders bumped in the hallway. Def. Ex. 86. Goodwin completed an incident report and told Henrysen

that C. had intentionally bumped into her, explaining that C. had been moving closer and closer to her over several weeks as they passed each other in the hallway.  Goodwin Dep. at 113-15.  Although Henrysen watched video of the event with Goodwin, the camera did not "capture the exchange."  Def. Ex. 88.  Laboski met with C. and emailed C.'s parole officer.  Def. Ex. 88.  Another staff member was assigned to monitor the hallway for a week, and Henrysen also monitored it the following day.  Def. Ex. 89.  McHale questioned why Hegen, rather than DeBona, was managing the incident.  Def. Ex. 86.

DeBona denied Goodwin's request to be present when an administrator instructed C. to stay away from her.  Def. Ex. 90.  Instead, Henrysen and Price set up a voluntary student "mediation" with both Goodwin and C. on April 10, 2016, id., during which DeBona instructed them to stay away from each other, and complained that Goodwin had wasted all of their time.  Goodwin Dep. at 121.

The next day, Goodwin's mother informed PSD that she was removing Goodwin from PHS.  Def. Ex. 90.  PSD offered no alternative options to accommodate Goodwin.  Id.  DeBona suggested "private schools, cyber schools, and home-school options," but noted that "if you choose to attend a public school, you will need to reside in [the school's] boundaries."  Id.  After Goodwin's mother warned that PSD might be legally obligated to send Goodwin to another public school district, Goodwin was offered an opportunity to be the first student in a pilot cyber program at PHS.  Def. Exs. 91-92.  This allowed Goodwin to technically remain a PHS student, but complete the fourth quarter of her junior year outside the building.  Id.

On April 20, 2016, DeBona barred Goodwin from the building when she returned to empty her locker.  Def. Ex. 93.  Henrysen later explained that although Goodwin technically was a PHS student in the pilot cyber program, she could not enter the building without an

appointment during the school day.  Id.

On April 27, 2016, Goodwin and her mother met with Henrysen and another PSD staff member to set up the pilot cyber program for Goodwin.  Def. Ex. 94.  Goodwin was unable to continue taking French III, Physical Education, and Broadcast Journalism in the cyber program, and was also unable to continue serving on student council.  PSOF ¶¶ 70-71.  Goodwin participated in the pilot cyber program during the fourth quarter, but ran into a conflict with PSD when she was required to take a state examination in Algebra.  The day of the exam, Goodwin's mother emailed PHS that Goodwin had only received notice of the examination the day before, and could not attend.  Def. Ex. 98.  Henrysen admitted he had failed to follow up with Goodwin about the exam, and suggested that Goodwin take the examination on the make-up dates in the guidance office.  Id.  DeBona did not, however, provide Henrysen's option to Goodwin's mother, who decided to have Goodwin "opt out" of the state examination.  Def. Ex. 101.

Goodwin returned to PHS her senior year, after H., N., B., and C. had graduated.  Id. ¶ 72.  During the first six weeks of school, both H. and B. entered the building when Goodwin was not there.  Def. Ex. 103.  H. had been authorized to enter by Laboski, who was aware that Goodwin had returned to PHS.  Laboski Dep. at 198.  H. even visited Goodwin's classroom that day, although she was absent that morning.  PSOF ¶ 73.  B. was permitted to enter as part of a military recruitment event, although PHS was not notified of his presence in advance.  Id.  On October 13, 2016, Goodwin's mother asked that Goodwin be notified before H., N., B., or C. was permitted to enter the building.  Def. Ex. 103.  After she was informed of these visits, DeBona emailed Goodwin's mother and assured her that H. would no longer be permitted in the building during school days and Goodwin would be notified before any future military recruitment events.  Id.

In May 2017, Goodwin learned that a classmate had invited B. to attend their senior prom. Def. Ex. 104. When Goodwin informed Hegen, he assured her B. would not be permitted to attend. Goodwin Dep. at 224. Before any non-student attends the PHS prom, they must fill out paperwork identifying their home school, principal, age, etc. Hegen Dep. at 353. Guests over age 21 and students with extensive disciplinary records are not permitted. Id. at 355. Once B.'s paperwork was officially submitted, DeBona permitted B. to attend part of the prom. Id. at 224–25. Goodwin was given the option of staying throughout, and a staff member would be assigned to provide emotional support for her and ensure her safety, but B. and his date would be permitted to attend after 8:30 p.m. Def. Ex. 104. During a May 18, 2017 meeting, Goodwin warned PSD that this restriction would elicit retribution from B.'s friends. Id. DeBona stated PSD would only forgo the prom-splitting plan with consent, in writing, from Goodwin's mother. Id. After the written consent was provided, administrators persisted with the prom-splitting plan, even though they knew B. could only attend the second half of the prom anyway. Def. Ex. 105. PSD also refused to rescind the prom-splitting plan when Goodwin's counsel contacted PSD counsel to advise that the proposed accommodation was worse for Goodwin than no accommodation at all. Def. Ex. 108. Finally, administrators learned before the prom that B. had decided not to attend, but failed to inform Goodwin in advance. Henrysen Dep. at 288-89.

## II.   Claim 1: Title IX Sexual Harrassment

To prove Title IX liability, Goodwin must show: (1) PSD received federal funds; (2) she was sexually harassed; (3) PSD had "substantial control" over both the harasser(s) and the context of the harassment; (4) PSD had "actual knowledge" of the harassment; (5) PSD was "deliberately indifferent" to the harassment; and (6) the harassment deprived her of access to educational opportunities or benefits. Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 650

(1999).

PSD concedes it receives federal funds.  If credited, Goodwin's evidence is sufficient to raise disputed issues of material fact regarding whether: (1) Goodwin was sexually harassed; (2) PSD had substantial control; (3) PSD had actual knowledge of the harassment; (4) PSD was deliberately indifferent to the harassment; and (5) the harassment caused a deprivation of educational opportunities or benefits.  Davis, 526 U.S. at 650.

### A.  Whether Goodwin was Sexually Harassed

#### a.  Was the Alleged Harassment Sexual

Like Title VII sexual harassment claims, Title IX hostile educational environment claims must be rooted in intentional sex discrimination.  Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 n.3 (3d Cir. 1990).  When a sexual assault triggers a course of harassment, the total course of events can be considered sexual harassment.  C.S. v. Southern Columbia Sch. Dist., No. 4:12-CV-1013, 2013 WL 2371413, at *9 (M.D. Pa. May 21, 2013) ("in light of the sexual assault, we cannot say as a matter of law that those contacts and threats from the perpetrators' friends do not amount to sexual harassment").  In 2010, the Department of Education alerted school districts that sexual harassment for Title IX purposes includes harassment by a group of male and female students, consisting of gender-based taunts, sexual rumors, and threatening texts, that was instigated by a break-up.  Dep't of Educ. OCR, "Dear Colleague" Letter (Oct. 26, 2010) ("2010 Dear Colleague Letter") at 6-7; see also Krebs v. New Kensington-Arnold Sch. Dist., No. 16-610, 2016 WL 6820402, at *3-4 (W.D. Pa. Nov. 17, 2016) (course of harassment by a large group of peers which included calling plaintiff fat and ugly, being threatened and attacked by female peers, being told to kill herself, and being targeted by her ex-boyfriend with terms like "whore" and "slut" constituted sexual harassment for purposes of Title IX claim).

Defendants claim Goodwin was not raped, and that any harassment she suffered from N., B., and C. was unrelated to any assault, but instead stemmed from Goodwin's "snitching." Def. Mem. at 12-14. A reasonable jury, however, could believe the harassment stemmed from the alleged rape by H. based on Goodwin's testimony and her contemporaneous complaints of being called "slut" by the same boys who were accusing her of snitching, as well as the possibility that the alleged "snitching" related to the rape itself. See Krebs, 2016 WL 6820402, at *3-4; C.S., 2013 WL 2371413, at *9. Whether H. and his friends targeted Goodwin because of the assault or for other reasons, as the Pennridge Defendants allege, must be resolved at trial.

b. Was the Alleged Harassment Severe or Pervasive

To constitute actionable sexual harassment, the offending behavior must be sufficiently "severe, pervasive, or objectively offensive" to create a hostile educational environment. Doe by & through Doe v. Boyertown Area Sch. Dist., 897 F.3d 518, 533 n.99 (3d Cir. 2018) (Title IX sexual harassment cases in the educational context should be guided by standards developed in Title VII workplace sexual harassment cases). To determine whether alleged harassment is "severe or pervasive," the "overall scenario" must be considered. Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 276 (3d Cir. 2001). However, a "single isolated incident" of sufficient severity can "create a hostile work environment." Castleberry v. STI Grp., 863 F.3d 259, 264-65 (3d Cir. 2017); see also Dep't of Educ. OCR, "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" (Jan. 2001) ("2001 Guidance") at 6 ("a single or isolated incident of sexual harassment may, if sufficiently severe, create a hostile environment").

The harassment must have been both subjectively offensive to the plaintiff and objectively offensive. Andrews, 895 F.2d at 1482-83; see also Grooms v. City of Philadelphia,

No. 17-2696, 2018 WL 4698856, at *6 (E.D. Pa. Sept. 28, 2018) (denying summary judgment because a reasonable jury could find three comments made to solicit sexual interaction in circumstances that reasonably led plaintiff to feel physically threatened were sufficient to establish a hostile work environment). Sexual harassment may be proven with evidence of physical abuse, Krebs, 2016 WL 6820402, at *2, threatening behavior, Jones v. Indiana Sch. Dist., 397 F. Supp. 2d 628, 634-37, 644-46 (W.D. Pa. 2005), and even mere presence if the prior harassment has been sufficiently severe, Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 717 (3d Cir. 1997) (being forced to work in proximity to former harassers is a "significant factor weighing in favor" of hostile work environment claim).

PSD claims Goodwin's alleged harassment was not severe, pervasive, or objectively offensive enough to create an actionable hostile environment under Title IX. See Def. Mem. at 31. Viewed in the light most favorable to Goodwin, however, the evidence establishes that she endured at least nine incidents in less than two years: (1) being the subject of rumors about her sexual activity and hearing that H. was boasting in April 2015 about assaulting her; (2) receiving a threatening text from B. in May 2015; (3) receiving a threatening text from N. in July 2015; (4) being unexpectedly scheduled in the same lunch with N., B., and C., and in the same study hall as H. and B., in September 2015; (5) unexpectedly seeing H. in an assembly; (6) being sworn at by H. in the hallway in November 2015; (7) being texted by C. on the anniversary of the assault; (8) being intentionally bumped in the hallway by C.; and (9) learning that, within the first six weeks of her senior year and even though they had already graduated, H. visited her classroom and B. visited the school without prior notice. Goodwin also has produced medical records showing her PTSD had worsened by the fall of her junior year. Crediting Goodwin's version of events, I "cannot say as a matter of law that the encounters were not severe, pervasive, or

14

objectively offensive."  <u>C.S.</u>, 2013 WL 2371413, at *10.  Only a jury can resolve that issue.

### B.  Whether PSD had "Substantial Control"

The parties agree Pennridge Defendants had no control over the December 2014 alleged rape and that PSD had no actual knowledge of the assault or any related harassment before March 13, 2015.  Pl. Mem. at 35-37.  The disputes center on PSD's actions once it learned of the alleged rape and ensuing harassment at school.

PSD contends it did not have substantial control over the harassers because many of the incidents Goodwin complained about took place off-campus, during school breaks, or in text messages.  Def. Mem. at 28.  Although PSD is not liable for behavior such as the alleged rape, it was responsible for addressing any ensuing hostile environment at school, including the rumors and taunting from H., N., B., and C.  2001 Guidance at 16.  A reasonable jury could conclude PSD had substantial control over the harassers during school and had the ability to remedy the hostile environment after Goodwin reported being traumatized by unexpected encounters, threats, and rumors.

### C.  Whether PSD had "Actual Knowledge"

PSD denies actual knowledge of many of Goodwin's allegations.  Def. Mem. at 36.  A jury, however, could credit Goodwin's evidence that the series of events were submitted in writing to PSD and through her extensive conversations with Henrysen.  Pl. Mem. at 35-36.

### D.  Whether PSD was Deliberately Indifferent

To establish that PSD's response to her allegations evinced "deliberate indifference," Goodwin must show its actions were "clearly unreasonable."  <u>Davis</u>, 526 U.S. at 648.  Failing to undertake new measures when an initial approach has failed can be sufficient to establish deliberate indifference, <u>S.K. v. N. Allegheny Sch. Dist.</u>, 168 F. Supp. 3d 786, 802 (W.D. Pa.

2016), but it requires "that the official disregard a known or obvious consequence of his action or inaction," <u>Bernard v. E. Stroudsburg Univ.</u>, No. 3:09-525, 2014 WL 4093069, at *3 (M.D. Pa. October 18, 2014).

Goodwin contends the evidence shows that PSD never investigated H.'s bragging about the sexual assault, the sexual rumors H., N., B., and C. were spreading about her, or N.'s harassing text. Pl. Resp. at 39. She argues the investigation of the assault and the incidents with H. and C. in the hallway were insufficient. <u>Id.</u> She also maintains that PSD's proposed "safety plan" was unreasonable because it did not prevent her from sharing a lunch with N., B., and C. or a study hall with H. or B., and did not change after the November 2015 hallway incident with H., the December 2015 anniversary text from C., or the April 2016 hallway encounter with C. Pl. Mem. at 40-41.

Whether the district's response to Goodwin's claims constitutes deliberate indifference is the closest question in a case full of close questions. Although PSD took some steps to address the issue, viewing the facts in the light most favorable to Goodwin, a reasonable jury could find in her favor. Even if PSD had no obligation to investigate the off-campus rape, it was required to respond promptly to the ensuing hostile environment. 2001 Guidance at 16. Instead, the school did nothing in response to Goodwin's reported rape, even after she complained she was traumatized by seeing H. and suffered from anxiety following the harassment from H. and his friends. Cortazzo only emailed Goodwin's teachers to allow her to leave class when she was experiencing anxiety on April 1, 2015, after being requested to do so by Goodwin's mother. Def. Exs. 29-30. It took another two weeks before Hegen tried to separate Goodwin from H. in the hallways by emailing her teachers to allow her to leave early and/or arrive late. Def. Ex. 31. Even this accommodation put the onus on Goodwin to miss class time and explain her absence to

other students. Department of Education Title IX guidance directs districts to devise accommodations that do "not penalize the student who was harassed." 2010 Dear Colleague Letter at 3. PSD did not investigate or respond to Goodwin's allegations that H. was bragging about sexually assaulting her and potentially others, and it never investigated the source of the sexual rumors about her or tried to stop them during school.

Although PSD responded quickly to the May 2015 threatening text from B., it failed to instruct B. to stay away from Goodwin. Def. Ex. 46; see 2001 Guidance at 16 ("it may be appropriate to . . . direct[] the harasser to have no further contact with the harassed student"). During the investigation, PSD reviewed a text from Goodwin stating that "all the 'sluts' and laughs" and rumors were making Goodwin feel suicidal. Pl. Ex. 24. Nonetheless, its response to B.'s threats did not include measures designed to prevent future rumor-mongering. PSD knew that Goodwin suffered a panic attack on the day B. returned to school following his suspension, Def. Ex. 30, but Hegen initially denied her request to finish the school year at home and asserted that she would need to accept different homebound instruction instead of finishing her classes, Def. Ex. 35. DeBona then failed to relay Henrysen's proposed accommodation that would have allowed Goodwin to take her state algebra exam.

Although Goodwin's mother initially contacted PSD administrators on August 18, 2015, Def. Ex. 52, and requested a meeting on August 24, 2015, Def. Ex. 54, no meeting was scheduled until after the school year had begun on August 31, 2015. By that time, Goodwin had found herself sharing a lunchroom with N., B., and C., despite her mother's requests that she be separated from them during lunch and gym. Pl. Ex. 17. The safety plans PSD offered to address Goodwin's lunchtime fears included changing her lunch period or notifying adult monitors of potential conflicts between Goodwin and the boys, putting the boys on "zero tolerance," Def. Ex.

56, and monitoring the boys' schedules, Def. Ex. 58. Department of Education guidance, however, specifically instructs that the burden of schedule changes should not fall on victims of harassment. 2010 Dear Colleague Letter at 3.

Goodwin and her mother repeatedly requested prior notice before she would be required to be in the boys' presence. Def. Ex. 58. Both Henrysen and Goodwin's therapist thought that part of the trauma she was experiencing related to the unpredictability of her encounters with H. Henrysen Dep. at 215-16. PSD essentially denied the request for prior notice by never providing it, and ineffectively monitored the boys' schedules. H. and Goodwin were unexpectedly in the same location for study hall, and the following day, Goodwin found she also shared a study hall location with B. Goodwin's mother immediately complained. Despite being instructed by Price to follow-up with her, Hegen failed to do so. Def. Ex. 58. Even assuming relocating the study halls was part of the safety plan, the move granted H. and B ongoing access to the cafeteria, the location of Goodwin's study hall, without any obligation to warn Goodwin. A jury must determine whether the accommodation was part of a safety plan and, if it was, whether the safety plan, which made no provision for prior notice to Goodwin, was "clearly unreasonable."

The extent to which the scheduling confusion contributed to Goodwin's mental health concerns is also disputed, but a reasonable jury could attribute the increased severity of Goodwin's PTSD to PSD's failure to keep her separated from H., N., B., and C. There are also disputed material facts about the October 2015 assembly. Although PSD cannot be found "clearly unreasonable" for failing to foresee that Goodwin and H. might attend a single assembly together, its actions could be considered unreasonable if administrators offered no assistance after she sought help, as Goodwin claims. Def. Ex. 77. Whether Henrysen's actions were an impromptu act of kindness or part of the safety plan organized by the district is a disputed

material fact that must be determined by a jury.

Whether PSD's responses to the November 2015 hallway incident with H., the December 2015 anniversary text from C., and the April 2016 hallway incident with C. were "clearly unreasonable" also merits resolution by a jury. H. used language that clearly violated PHS's behavioral standards, but was not disciplined. Further, DeBona instructed Hegen that Goodwin did not need to be informed of how H. was disciplined. Def. Ex. 80. DeBona's instructions directly conflict with federal Title IX guidance. 2001 Guidance at vii. Since H. was not disciplined and was apparently told that his conflicts with Goodwin were not his fault, a reasonable jury could conclude that Goodwin and her mother were misled.

After the December 2015 incident with C., no change was made to the lunch period safety plan, despite the "zero tolerance" that PSD had supposedly imposed. Pl. Ex. 42. Hegen decided not to change C.'s lunch before the incident had been investigated. Def. Exs. 81, 85. A reasonable jury could find Hegen was deliberately indifferent to Goodwin's concerns because even PSD's Title IX coordinator questioned why Hegen was still making decisions about Goodwin's safety plan. Def. Ex. 84.

Goodwin has produced evidence from which a reasonable jury could find DeBona was deliberately indifferent to her harassment. After the April 2016 hallway incident with C., Goodwin was told she could not be present while an administrator instructed C. to stay away from her, which led to the meeting in which DeBona instructed Goodwin and her harasser to stay away from each other. Goodwin Dep. at 121. Department of Education guidance, in contrast, specifically notes that it may be necessary to instruct a harasser to apologize to a victim. 2001 Guidance at 16. A reasonable jury could further find DeBona deliberately indifferent because she barred Goodwin from school even though she remained a PHS student while a few months

later, H. and B. were admitted after they had already graduated. Def. Ex. 93. It could conclude that DeBona was deliberately indifferent when she failed to offer any alternative placements for the final quarter of Goodwin's junior year until Goodwin's mother disclosed that the district might be legally obligated to pay for Goodwin to attend an alternative public school, and when DeBona failed to offer an available accommodation for Goodwin's state exam. Def. Exs. 91-92.

Finally, a reasonable jury could find DeBona was deliberately indifferent by overruling Hegen's initial conclusion that B. should be excluded from Goodwin's prom, and then insisting on the time-sharing "accommodation" even after Goodwin, her mother, and Goodwin's lawyer explained that the proposed accommodation could exacerbate the harassment. See Krebs, 2016 WL 6820402, at *4; C.S., 2013 WL 2371413, at *1; see also Vance v. Spencer Cty. Pub. Sch. Dist., 231 F.3d 253, 259 (6th Cir. 2000) (alleged harassment was sufficient to state a Title IX claim when the student's complaints "curiously warranted . . . completing her studies at home, but not an investigation"); cf. Konstantopoulos, 112 F.3d at 716 (finding formerly hostile environment was remedied when, upon employee's return to work after period of leave, co-workers had been warned against harassment; new procedures for remedying improper conduct had been implemented; supervisor made frequent, unannounced visits to the area; and employee made no further complaints). A reasonable jury could find it "clearly unreasonable" that PSD described the prom-sharing plan as an accommodation even after administrators learned that B. was only able to attend the second half of the prom based on his schedule, and that they failed to inform Goodwin when B. decided not to attend.

E. Access to Educational Benefits

A reasonable jury could also conclude that Goodwin was forced to leave PHS when it failed to effectively manage her harassment. It could conclude that the alternative placement

PSD offered Goodwin in the pilot cyber program deprived her of educational opportunities because it did not allow her to continue her education at the same level she had been performing at PHS or continue her extracurricular activities. PSOF ¶¶ 70-71.

Defendants' motion for summary judgment is denied as to Count 1. Goodwin has produced sufficient evidence from which a reasonable jury could find that: (1) after the alleged rape, H. and his friends embarked on a campaign of harassment that included spreading sexual rumors about her; (2) after she reported the rape, H. and his friends intensified their campaign to include intimidating texts; (3) PSD failed to reasonably accommodate Goodwin by failing to fully separate her from her harassers, failing to notify her before she was put in the presence of her harassers, and failing to follow its own safety plan of offering "zero tolerance" to her harassers after September 2015; and (4) after making clearly unreasonable accommodations for her at PHS, PSD failed to offer Goodwin an equivalent educational environment.

### III.    Claim 2: § 1983 Equal Protection

To establish a hostile environment equal protection claim, Goodwin must prove all the elements of her Title IX claim and that "the harassment was the result of municipal custom, policy, or practice." Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 257-58 (2009) (citing Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 694 (1978)). Goodwin also must show "that such a policy or custom was the proximate cause" of her injuries. Watson v. Abington Twp., 478 F.3d 144, 156 (3d Cir. 2007).

Goodwin challenges the PSD policies of: (1) failing to notify the Title IX coordinator of all harassment complaints; (2) failing to investigate all reports of harassment, regardless of where they occur; (3) failing to investigate or discipline students for sexual assault independently of the police; and (4) failing to submit written reports of harassment investigations to the Title IX

coordinator.  Pl. Mem. at 50.  Defendants deny such policies exist.  Def. Resp. at 24-26.

Unlike Doe,[3] Goodwin cannot establish that PSD's failure to follow its own Title IX procedure caused her damages.  Watson, 478 F.3d at 156.  Goodwin was not harmed by PSD's failure to notify McHale of her harassment complaints because Goodwin's mother informed McHale of Goodwin's historical harassment complaints.  See, e.g., Def. Ex. 54.  Further, after Goodwin and her mother requested McHale's involvement in August 2015, PSD kept McHale involved.  To the extent PSD failed to keep McHale informed, Goodwin's mother made up for that failure.  PSD's failure to submit any written reports of harassment investigations to McHale could not have harmed Goodwin because the reports would not have provided additional information beyond what administrators and Goodwin herself were providing.  Even assuming PSD had unwritten policies of not notifying McHale of all harassment complaints and not submitting written reports of investigations to her, Goodwin cannot show those policies – her first and fourth theories of liability – were the proximate cause of her injuries.  She successfully circumvented the policies she now challenges.

Goodwin's second and third theories fail as a matter of law.  Goodwin relies on Department of Education guidance that was in effect when she made her March 2015 complaint to argue PSD was required to investigate allegations of off-campus sexual violence.  In an April 4, 2011 Dear Colleague letter, the Department of Education noted that, "[i]f a student files a complaint with the school, regardless of where the conduct occurred, the school must process the complaint in accordance with its established procedures."  Dep't of Educ. OCR, "Dear Colleague" Letter (April 4, 2011).  Three years later, the Department reiterated that schools must "process all complaints of sexual violence, regardless of where the conduct occurred," and that

---

[3]      Doe v. Pennridge Sch. Dist., No. 17-3570, 2019 WL 2011069 (E.D. Pa. May 7, 2019).

"[t]he mere presence on campus or in an off-campus education program or activity of the alleged perpetrator of off-campus sexual violence can have continuing effects that create a hostile environment." Dep't of Educ. OCR, "Questions and Answers on Title IX and Sexual Violence" (April 29, 2014) ("4/2014 Q&A") at 29-30.

Nonetheless, these guidances did not establish a student's right to an investigation. Both note they "do not add requirements to applicable law." 4/2011 Dear Colleague Letter at 1 n.1; 4/2014 Q&A at 1 n.1. Further, both acknowledge the different legal standards applicable to administrative enforcement actions and private suits for monetary damages. 4/2011 Dear Colleague Letter at 4 n.12; 4/2014 Q&A at 1 n.9. Moreover, guidance letters do not merit the same deference afforded to other types of administrative agency determinations or policies. K.D. by & through Dunn v. Downingtown Area Sch. Dist., 904 F.3d 248, 255–56 (3d Cir. 2018) (citing Christensen v. Harris Cty., 529 U.S. 576, 586-87 (2000) and Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837 (1984)). Like the "Dear Colleague" letter discussed in K.D., the 2011 and 2014 Department of Education guidances neither reference nor explain a specific statutory or regulatory obligation. See 904 F.3d at 255-56.

Finally, both guidances were rescinded in 2017 because there was no notice and comment period before they were issued, and also because they constituted "a confusing and counterproductive set of regulatory mandates." Dep't of Educ. OCR, "Dear Colleague" Letter (Sept. 22, 2017). New guidance notes there is no "duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient," although schools are "responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities." Dep't of Educ. OCR, "Q&A on Campus Sexual Misconduct" (Sept. 2017). Even assuming the guidances were "'thorough[ly]

. . . consider[ed]' and 'valid[ly] . . . reason[ed]' about the meaning of" Title IX, they did not "clearly establish" specific new procedural rights for sexual harassment victims.  K.D., 904 F.3d at 256 (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).

Because Goodwin cannot show the municipal policies or customs she identified were either illegal or caused her damages, her § 1983 hostile environment claim must fail.

### IV.    Claim 4: Supervisory Liability Against Rattigan and DeBona

To establish supervisory liability against Rattigan and DeBona for her § 1983 hostile environment claim, Goodwin must identify their "affirmative conduct."  Andrews, 895 F.2d at 1478.  This conduct can be that one or both "established and maintained a policy, practice or custom which directly caused the constitutional harm," or "participated in violating Plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced to" her subordinate's violations.  A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr., 372 F.3d 572, 585 (3d Cir. 2004).

As I explained, supra § III, Goodwin cannot establish that she was harmed by any of the policies or customs she identified.  Therefore, she cannot establish supervisory liability of Rattigan or DeBona for ratifying or participating in their execution.

### V.    Claim 3: Failure to Train Against PSD

To establish a § 1983 failure to train claim, Goodwin must prove there was: (1) an "identified deficiency" in the training (2) caused by a deliberate indifference to her rights (3) that "actually caused" the constitutional violation.  Thomas v. Cumberland Cty., 749 F.3d 217, 222 (3d Cir. 2014); see also Kline ex rel. Arndt v. Mansfield, 255 F. App'x 624, 629 (3d Cir. 2007) ("Failure to train can be the basis for Hamburg's liability if the failure to train reflects a deliberate or conscious choice by Hamburg").

A.  PSD's Title IX Training

The parties dispute the amount and adequacy of training that was provided.  DSOF ¶¶
244-350.  Defendants contend that multiple in-person trainings were provided throughout the
2013-2014, 2014-2015, and 2015-2016 school years in presentations and meetings and that,
beginning in the 2015-2016 school year, online training was also conducted.  Id.  Goodwin
contends there is no evidence of some of the informal trainings and that the formal training
documentation suggests it inadequately addressed Title IX.  Id.

The cross-motions for summary judgment are denied.  Defendants cannot prove as a
matter of law that their training was adequate because Goodwin has identified deficiencies in the
training materials.  Pl. Mem. at 17-25.  Moreover, PSD cannot dispute that, as of August 2015,
Hegen was unable to identify the Title IX coordinator, Def. Ex. 53, a fact that could help justify a
jury verdict for Goodwin.

Nevertheless, Goodwin cannot prove as a matter of law that any training deficiencies
caused her damages.  Because the material factual disputes described above preclude finding as a
matter of law that she suffered statutory or constitutional damage, she cannot be awarded
summary judgment.  Banks v. Gallagher, 686 F. Supp. 2d 499, 511 (M.D. Pa. 2009) ("[f]or a
failure to train claim . . . the first element is proof that an underlying constitutional violation has
occurred . . . [and because] . . . the evidence provided . . . could only possibly demonstrate a
violation . . . summary judgment is inappropriate").  Finally, there are material factual disputes as
to the content of the training, apart from the documentation of the training, that must be resolved
by a jury.  See DSOF ¶¶ 245-315.

B.  Official Capacity Failure to Train Claim Against Individual Defendants

Goodwin brought her failure to train claim against PSD as well as Rattigan and DeBona, who were both acting in their official capacities to the extent they planned, and/or failed to plan, PSD employee Title IX training.  Am. Compl. ¶¶ 99-105.  Because inclusion of the individual defendants in this claim is merely redundant with the real party in interest, PSD, I will dismiss Goodwin's Count 3 failure to train claim against Defendants Rattigan and DeBona.  Hall v. Raech, No. 08-5020, 2009 WL 811503, at *3 (E.D. Pa. Mar. 25, 2009).

An appropriate Order follows.